**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION, LOCAL 12, Respondent.**

No. 20914.

United States Court of Appeals Ninth Circuit.

April 18, 1967.

As Amended on Denial of Rehearing May 18, 1967.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Warren M. Davison, William Wachter, Attys., N.L.R.B., Washington, D.C., Thomas P. Graham, Director, N.L.R.B., Seattle, Wash., Robert J. Weiner, Officer-in-charge, N.L.R.B., Portland, Ore., for appellant.

Norman Leonard, Gladstein, Andersen, Leonard & Sibbett, San Francisco, Cal., Pozzi, Levin & Wilson, Portland, Ore., for appellee.

Before CHAMBERS and HAMLEY, Circuit Judges, and BYRNE, District Judge.

HAMLEY, Circuit Judge:

The National Labor Relations Board (Board) petitions for enforcement of its order of November 18, 1965, issued against respondent, International Longshoremen's and Warehousemen's Union, Local 12. The Board decision and order is reported at 155 N.L.R.B. No. 89.

The Board's regional director alleged in his complaint that Local 12 had engaged in unfair labor practices in violation of section 8(b) (1) (A) and 8(b) (2) of the National Labor Relations Act (Act), 49 Stat. 452, as amended, 29 U.S.C. § 158(b) (1) (A) and (b) (2) (1964). Local 12 had violated these statutes, it was alleged, by failing to dispatch Donald Wilson, Bernard Warnken and Lee Thomas, the charging parties, from the dispatch hall, and by excluding them from the dispatch hall. The trial examiner entered findings and conclusions upholding the charges and upon agency review, the Board adhered to the trial examiner's findings and conclusions.[1]

The Board order requires Local 12, together with its officers and agents, to cease and desist from the specified unfair labor practices. It also requires them to make Wilson, Warnken and Thomas whole for loss of pay suffered by reason of such practices. In addition, the order contains the usual provisions concerning the posting of notices and the giving of notifications.

Wilson, Warnken and Thomas worked out of North Bend-Coos Bay, Oregon, longshoremen's dispatch hall. The hall was established pursuant to a collective bargaining agreement between the International Longshoremen's and Warehousemen's Union (ILWU), of which Local 12 is an affiliate, and an association of employers known as the Pacific Maritime Association (PMA). Under the terms of that agreement, the hall, which offers the only means longshoremen have of obtaining work in that area, is governed by a joint committee of union and employer representatives.

Under the terms of the agreement, longshoremen registered under the PMA–ILWU contract have first preference of dispatch. A longshoreman who is not so registered is known as a "casual," and may be dispatched for employment if there are no registered longshoremen present, provided he pays his pro rata share of dispatching hall expenses. It is the practice for casual workers seeking employment to telephone for a recorded tape message which indicates whether there is any prospect for employment of casuals on that day. If there is such a prospect, the casuals who telephone may come to the dispatch hall, where available work is assigned out by a dispatcher.

Wilson, Warnken and Thomas were casuals. On August 18, 1964, Wilson complained to William Armstrong, president of Local 12, that the dispatchers were discriminating against them by preferring casuals who were sons of registered longshoremen. These three indicated to Armstrong their intention to picket unless the discrimination was discontinued. Receiving no assurance that the matter would be investigated, they picketed the hall for fifteen minutes on August 19, 1964. They discontinued this when Armstrong assured them that the joint committee would meet with them at 7:30 p. m. on August 21, 1964. The three were present at the time and place set for the meeting, but no meeting was held.

On August 29, 1964, Wilson was put in touch by telephone with W. B. Ferguson, a PMA representative of the joint committee, who told him to file with that committee a written statement of grievances. Wilson, Warnken and Thomas filed such a statement with the committee later that day. Wilson, Warnken and

---

1. The Board order modifies, in certain respects, the trial examiner's recommended remedy.

Thomas made an oral presentation of their grievances before the joint committee on September 2, 1964. The committee then agreed to take the matter under consideration and the three casuals stated that they would abide by the committee's decision. No action having been taken by September 26, 1964, Wilson, Warnken and Thomas wrote to Ferguson complaining that the situation at the dispatch hall was much worse. Ferguson wrote back, assuring these men that the committee was investigating the grievances, and urging them to postpone " * * * any unnecessary drastic action until our efforts have been expended. * * * "

On October 5, 6 and 7, there were many ships in the bay and every casual working out of the dispatch hall was hired except Wilson, Warnken and Thomas. Rather than dispatch these three casuals, the dispatchers recruited men from taverns and from a nearby Air Force base to serve the ships then in the bay.

On October 8, 1964, Thomas and Warnken were at the hall. Armstrong who was at the hall that day, testified that these men told other casuals who were present, "Go on up to the window; there's plenty of work." They were referring to the small window through which a prospective casual could talk to a dispatcher. This was contrary to the dispatcher's practice of lining up casuals who were at the hall to select those needed for available jobs, rather than to dispatch casuals one at a time through the window.

Joe Jakovac, the relief dispatcher who was then on duty, did not know exactly what Thomas and Warnken were then doing, but testified that he knew that for several days they had been walking around the hall talking to others and trying to start a strike against the hiring procedures. On October 8, 1964, believing that Thomas and Warnken were dis-

rupting established dispatch hall practices, Jakovac stopped the hiring and in the presence of Armstrong, president of Local 12, told them to leave the hall. As they started to leave they met Wilson and told him what Jakovac had said. All three then left. Later the same day, Thomas returned to the hall to talk to Jakovac, but Jakovac told him to " * * * get out and stay out."

Local 12 claimed in the Board proceeding that this eviction was intended to be for that day only. The trial examiner found, however, that in view of the entire context of events, including Jakovac's last statement to Thomas, the eviction was not intended for just one day. The trial examiner also found that Wilson was correct in assuming that he was included in the eviction although Jakovac did not speak directly to him.

The three casuals advised Ferguson of their expulsion from the dispatch hall. Ferguson requested that they take no further action until they heard from him on October 13, 1964. Not having heard from him by that date, Wilson, Warnken and Thomas resumed picketing the dispatch hall the next day and continued to do so until the unfair labor practice charge was filed on October 20, 1964.

The charges came to the attention of the joint committee at a meeting held on October 21, 1964. At that meeting the employer representatives announced that they would have nothing further to do with the matter. The committee has made no disposition of the grievance.

On or about November 13, 1964, a Board representative advised the three casuals to return to the hall and attempt to obtain dispatch to employment. This they did without success.[2]

Based on findings to this general effect, the trial examiner further found that Local 12 discriminated against Wilson, Warnken and Thomas, by refusing

---

2. Wilson continued reporting to the hiring hall for about fifty days without securing employment. He obtained other employment on February 16, 1965. Warnken regularly went to the hiring hall between November 13, 1964 and March 23, 1965, the date of the hearing in this matter, without being dispatched. Thomas regularly went to the hall between November 13, 1964 and December 4 or 5, 1964, without being dispatched.

to dispatch them when work was available, and by excluding them from the dispatch hall. The reason for such discrimination, the trial examiner found, was to effectuate reprisal for the concerted activities in which these three had engaged. These activities consisted of their concerted protest against Local 12's method of operating the dispatch hall, manifested by picketing the hall, filing a grievance with the joint committee, and making a personal appeal to other casuals present at the dispatch hall on several occasions.

The trial examiner concluded that by reason of the discrimination practiced against these three casuals, Local 12 had committed an unfair labor practice within the meaning of section 8(b) (2) of the Act, by causing or attempting to cause employers to encourage membership in a labor organization in violation of section 8(a) (3) of the Act, 49 Stat. 452, as amended, 29 U.S.C. § 158(a) (3) (1964). Such encouragement, the trial examiner concluded, resulted when the three employees were made aware, through union-motivated discriminatory practices, that they could not expect employment unless they became members of the union and remained in good standing. The trial examiner also concluded that Local 12 committed an unfair labor practice within the meaning of section 8(b) (1) (A) of the Act, by restraining or coercing these three employees in the exercise of rights guaranteed in section 7 of the Act, 49 Stat. 452, as amended, 29 U.S.C. § 157 (1964), particularly the right to engage in concerted activities for the purpose of mutual aid or protection.

In resisting the petition for enforcement, respondent first contests the trial examiner's holding, adopted by the

Board, that Local 12 committed an unfair labor practice under section 8(b) (1) (A), by restraining or coercing Wilson, Warnken and Thomas in the exercise of rights guaranteed in section 7 of the Act.

■ Respondent argues that there is no showing that Wilson, Warnken and Thomas were restrained or coerced with respect to any protected activity. The issue raised by this argument is whether this particular finding of the trial examiner is supported by substantial evidence on the record considered as a whole, this being a proper subject of inquiry in a Board enforcement proceeding. See section 10(e) of the Act, 49 Stat. 453, 29 U.S.C. § 160(e) (1964).[3]

Before these three casuals manifested their protest by picketing, and by filing a grievance with the joint committee, discriminatory hiring practices were limited to preferring of sons of union members over other casuals. Afterwards, Wilson, Warnken and Thomas were not dispatched at all even when, because of the number of ships in the bay, it was necessary to recruit men from taverns and an Air Force base. When these three men, through concerted activity, sought to call the attention of other casuals present in the dispatch hall to the discriminatory practices, they were ordered out of the dispatch hall. While a dispatcher testified that the exclusion was only intended to be for one day, Wilson, Warnken and Thomas were not so advised by the dispatchers, even when they resumed picketing of the dispatch hall.[4]

While the evidence shows that work dropped off substantially in the last quarter of 1964, it is not contended that there was no work for casuals during

3. In considering that question we are required to apply the rule announced in Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456, that the substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.

4. Respondent argues that these three casuals made themselves unavailable for employment for work from October 8, 1964,

when they were barred from the dispatch hall, until November 13, 1964, when they returned to the hall at the suggestion of the Board representative. However, we agree with the trial examiner that after these men were told to get out of the dispatch hall, it was the respondent's responsibility to notify them that the dispatch hall was open to them before it could claim that these men had made themselves unavailable for dispatch.

that period. Respondent argues (citing Iron Workers Local 433, 151 NLRB 1092), that where it is not shown that any union representative exhibited hostility to, or resentment against, persons who were not dispatched, it may not be found that such failure was for the purpose of restraining or coercing protected concerted activity. Without passing upon the question of whether a showing of hostility or resentment is indispensable, we believe that hostility and resentment on the part of the dispatchers were demonstrated here. We also think there was a sufficient showing of a specific discriminatory motivation.

Respondent contends that the conduct of Wilson, Warnken and Thomas in the dispatch hall was not protected activity under section 7, pointing to testimony that they were disrupting the operation of the dispatch hall. If the three casuals were disrupting such operations, they should have been advised to this effect and asked to desist. Instead, without explanation, they were ordered to leave. Under these circumstances they were entitled to assume that they were being excluded because they sought support for their protest against the hiring practices.

■ Giving application to the rule of *Universal Camera*, supra note 3, we hold that there is substantial evidence supporting the Board finding that, by reason of the described conduct of the dispatchers, Wilson, Warnken and Thomas were restrained in their protected and concerted effort to protest the discriminatory hiring practices of the North Bend-Coos Bay dispatch hall.

Respondent next contends that there is no substantial evidence to support the finding of the Board that Local 12 caused employers to discriminate against Wilson, Warnken and Thomas, in violation of section 8(b) (2) of the Act.[5] The trial examiner found, in effect, that such employer discrimination consisted in withholding employment from these three casuals. The effect of such discrimination, the trial examiner could reasonably conclude, was to encourage them to join the union in order to obtain work assignments.

■ Respondent argues that there is no evidence in this record which shows that Local 12 caused or attempted to cause employers to discriminate against these three casuals in the· manner just described. Again applying the *Universal Camera* test, we believe there was ample evidence of this kind. After Wilson, Warnken and Thomas had engaged in concerted activities in protest against the hiring practices, the employer discrimination was caused or attempted to be caused by Local 12 through the simple expedient of not dispatching these men to any of the employers. Respondent is chargeable with knowing that this employer discrimination, which respondent caused, would tend to encourage Wilson, Warnken and Thomas to become union members so that the discrimination would cease.

Respondent also argues that any liability which could arise from the two unfair labor practices discussed above, should not attach to Local 12, but to the International Union, which is not a party to these proceedings. The Board, however, adopted the trial examiner's finding which stated that Local 12 could be held liable for the dispatcher's acts on either a joint venture or an agency theory.

■ We need not decide whether the trial examiner's joint venture theory has application here because, in any event, the agency theory provides an adequate ground for holding Local 12 liable for the acts of the dispatcher. See N.L.R.B. v. International Longshoremen's and Warehousemen's Union, 9 Cir., 210 F.2d 581; N.L.R.B. v. International Long-

---

5. As noted above, section 8(b) (2) of the Act makes it an unfair labor practice for a labor organization to cause or attempt to cause an employer to discriminate against an employee in violation of

section 8(a) (3) of the Act. Section 8 (a) (3) prohibits employer discrimination against employees "to encourage or discourage membership in any labor organization: * * *"

shoremen's and Warehousemen's Union, Local 10, 9 Cir., 283 F.2d 558, note 5, 100 A.L.R.2d 348.

Moreover, since the examiner also properly found that Local 12 was bound directly by the acts of the dispatchers, it could be held responsible for the dispatcher's conduct regardless of whether an agency relationship existed between International and Local 12.

Respondent contended before the trial examiner that it was not responsible for the unlawful operation of the dispatch hall because the hall was under the immediate control of the joint committee, half of whose members were employer representatives associated with PMA. The trial examiner concluded, however, that since Local 12 elected the dispatchers [6] and paid for one-half the cost of maintaining the dispatching hall, it was responsible for the acts of dispatchers whom it selected and paid. This conclusion is consistent with this court's opinion in N.L.R.B. v. I.L.W.U., 9 Cir., 210 F.2d 581, 584.

In addition, Armstrong, president of Local 12, was present when Wilson and Warnken were told to leave the dispatch hall and apparently acquiesced therein. Under this circumstance and the other circumstances discussed above, we are of the view that the trial examiner did not err in concluding that Local 12 could be held responsible for the discrimination which occurred.

Local 12 attacks the provision of the Board order which requires the local to make whole Wilson, Warnken and Thomas from October 5, 1964, for any loss of pay suffered by them as a result of the discrimination of Local 12 against them. The Board order provides that such payment shall be equal to the amount of wages they would have earned but for the discrimination practiced against them, computed on the basis of each separate calendar quarter or portion thereof, together with interest at the rate of six per cent per annum.

Local 12 asserts that this back-pay provision is contrary to the holding in N.L.R.B. v. Local 2, Etc., 2 Cir., 360 F.2d 428. In that case, the court modified a Board back-pay order which did not appear to contemplate an inquiry into the length of time the employer would have kept the charging parties at work.

■ As we read the order here in issue, it contemplates such an inquiry in the compliance proceeding. Such a compliance proceeding usually commences with the issuance, by a Board official, of a back-pay specification. If the answer thereto filed by the respondent presents an issue of fact, a hearing is held before a trial examiner. Therefore, no modification of the order in this regard is needed.

Finally, respondent argues that the proceeding should be remanded to the Board with directions that it consider whether the picketing by Wilson, Warnken and Thomas, and their submission of demands or requests, were protected activities within the meaning of section 7, in view of the fact that the collective bargaining contract contains a no-strike clause and provisions setting up grievance and arbitration procedures.

■ The no-strike provision of the collective bargaining agreement has no application in this case because the picketing and other activities of Wilson, Warnken and Thomas did not constitute a strike or work stoppage by employees against one or more employers. See N.L.R.B. v. Illinois Bell Telephone Co., 7 Cir., 189 F.2d 124, 127; THE POINT REYES, 5 Cir., 110 F.2d 608, 609–610; C. G. Conn, Ltd. v. N.L.R.B., 7 Cir., 108 F.2d 390, 397.

The question of the availability of the grievance procedure is not properly be-

---

6. Section 8.21 of the 1961–1966 agreement between PMA and ILWU provides that the personnel for each dispatching hall, with the exception of dispatchers, would be appointed by the joint committee. Dispatchers were to be selected by ILWU through elections. In application of these provisions, however, it was the membership of Local 12 which elected the dispatchers.

fore us. Insofar as the record before us indicates, the only objection which respondent made before the agency with reference to whether respondent had restrained or coerced Wilson, Warnken and Thomas in engaging in a protected activity, had to do with their activity within the dispatch hall in seeking to enlist the support of other casuals. As to this particular occurrence, respondent's only contention was that the activity was not protected because it involved a disruption of the dispatch hall—not because alternative grievance procedures were available.

Since the argument which respondent now advances was not the basis of any objection made in the agency proceeding, it is not available to respondent in this court. See section 10(e) of the Act, 49 Stat. 454, 29 U.S.C. § 160(e) (1964); N.L.R.B. v. Cheney California Lumber Co., 327 U.S. 385, 387–388, 66 S. Ct. 553, 90 L.Ed. 739; N.L.R.B. v. International Ass'n of Machinists, Lodge 942, AFL-CIO, 9 Cir., 263 F.2d 796, 798.

The petition will be enforced.