**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION, LOCAL NO. 13, Respondent.**

**No. 74-3158.**

United States Court of Appeals, Ninth Circuit.

March 15, 1977.

Rehearing and Rehearing En Banc Denied May 20, 1977.

Martha Goldin, Hollywood, Cal., argued, for respondent.

Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Judith Wilkenfeld, Washington, D. C., argued, for petitioner.

Before DUNIWAY, HUFSTEDLER and ANDERSON, Circuit Judges.

## OPINION

DUNIWAY, Circuit Judge:

In these consolidated cases, the National Labor Relations Board seeks enforcement of its order issued on May 26, 1974, against International Longshoremen's and Warehousemen's Union, Local 13, reported at 210 N.L.R.B. 952. We enforce the order.

In the first of these lengthy disputes, the Union was charged with violating §§ 8(b)(1)(A) and (2) of the National Labor Relations Act, 29 U.S.C. §§ 158(b)(1)(A) and (2) (1970), by requiring that applicants for registration as Class B longshoremen be sponsored by Class A registrants, who were also Union members. On June 10, 1970, the Board issued its decision and order in *International Longshoremen's and Warehousemen's Union, Local 13*, 183 N.L.R.B. 221 (the *Gatlin* case), finding that the Union had committed the violations. The Board petitioned this court for enforcement of that order, and on April 19, 1972, we remanded the Board's decision for further findings as to "(1) the actual operation of the sponsorship program and (2) the effect of the program." *N.L.R.B. v. International Longshoremen's and Warehousemen's Union, Local 13*, 9 Cir., 1972, 80 L.R.R.M. 3213, 3214.

While the *Gatlin* case was pending before us, on July 28, 1971, the Board issued its decision and order in *International Longshoremen's and Warehousemen's Union, Local 13*, 192 N.L.R.B. 260 (the *PMA* case), finding that, *inter alia*, the Union violated [1] Section 8(b)(1)(A) and (2) by continuing to require that applicants for Class B registration be sponsored by a member of the

Union or by a former member with a withdrawal card; [2] Section 8(b)(1)(A) and (2) by operating an exclusive hiring hall in a manner which discriminated against non-Union men in referrals by insisting that applicants with Union sponsorship or Union membership be given preference in the referral register; and [3] Section 8(b)(3) by insisting to impasse during negotiations with the Pacific Maritime Association (PMA) upon illegal use of sponsorship and by unilaterally changing the manner of dispatch and registration set up pursuant to the collective bargaining agreement. The Board then petitioned this court for enforcement of that order. After the remand in the *Gatlin* case, however, we granted the Board's motion to withdraw its application for enforcement in the *PMA* case to enable it to take further evidence.

The cases were consolidated and hearings held before an administrative law judge. The Board adopted his findings and conclusions, which affirmed its earlier decision that the Union had violated the Act. The Board ordered the Union, *inter alia*, to cease and desist (1) from any further use of the sponsorship system; (2) from discriminating in favor of Union members in dispatching longshoremen; and (3) from refusing to bargain in good faith. Affirmatively, the Union was ordered to pay all applicants for lost wages resulting from the Union's discrimination and to maintain permanent records of all referrals.

## FACTS

The Union is the exclusive bargaining representative for workers performing longshore labor in the Los Angeles-Long Beach harbor area, under a collective bargaining agreement with PMA, which is the collective bargaining agent for the stevedore employers of the Pacific Coast.

The agreement establishes various joint committees having equal numbers of PMA and Union representatives. The Joint Coast Labor Relations Committee (Joint Coast Committee) has jurisdiction over contract grievances and decisions relating to the operation of the dispatching halls. Beneath that Committee, at each port, there is a Joint Port Labor Relations Committee (Port Committee), which controls the dispatching of longshoremen through hiring halls and which also controls the registration lists and has the power to make additions to, and deletions from, those lists. Although the Port Committee includes representatives of PMA and the Union, longshoremen are dispatched from the hiring hall by dispatchers elected by the Union's membership.

Under the agreement, first preference in dispatch to longshore jobs is given to registered longshoremen, i. e., Class A longshoremen, and second preference to Class B or limited registered men. When no Class A or Class B men are available, unregistered men or "casuals" may be dispatched. All Class A registrants are normally members of the Union, whereas Class B registrants and unregistered men generally are not Union members.

For a number of years, the Union had maintained a policy of requiring that applicants for Class B status be sponsored by an eligible Class A registrant. In practice, that meant that virtually all sponsors were Union members. On November 23, 1965, the Joint Coast Committee called for a halt to the sponsorship program and informed the Union and PMA that the sponsorship program used in the past would be used only in the current registration of longshoremen and then would be discontinued.

Beginning in January, 1967, a series of Port Committee hearings were held concerning the selection of an additional 200 Class B longshoremen. (The number was later increased to 400.) The Union representatives continued to insist upon using the sponsorship system. After receiving instructions in January, 1968, from the Joint Coast Committee, PMA prepared a list of 475 applicants selected on the basis of a point system giving weight to such factors as education and work experience. The Union refused to approve such a list without applying the sponsorship requirement. PMA, in accordance with section 17 of the contract, then submitted the matter to arbi-

tration. The arbitrator decided that the Union was in violation of the contract by insisting upon the use of sponsors. Despite the arbitration award, the Union refused to cooperate.

At a meeting on October 2, 1968, the Union submitted a list of 254 names for immediate registration as Class B longshoremen. Next to each name on the list was the name of a Class A sponsor. PMA refused to accept such a list based on the sponsorship system. No agreement was reached, and there was no registration of Class B longshoremen before February 12, 1970, when the Union agreed to drop its sponsorship demand.

During this process, in June, 1967, James Phillips, a casual, unregistered longshoreman, completed an application for Class B registration. Phillips did not have a sponsor. When he asked about the status of his application on February 20, 1969, the Union's secretary-treasurer told him that he needed a sponsor. On March 18, 1969, Phillips filed two amended charges claiming that this sponsorship procedure violated §§ 8(b)(1)(A) and (2). Those are the charges upon which the *Gatlin* case is based.

The *PMA* case arose from a slightly different set of facts and concerned alleged preferences given by the Union dispatchers to one category of men with another type of Union membership. Terminal warehousemen (TWs) are a category of union membership, not longshoremen, created early in 1968, initially being only 41 men. That number was increased by the Union's approval of an additional 635 TW applications in 1969.

During typical months from January 1, 1967, to May 25, 1970, approximately 80 TW members were employed steadily under terminal warehouse contracts, and an average of six extra men per day were assigned to other TW contract jobs. Before and during the first few months of 1969, few TW members were dispatched to longshore work as compared to the number of unregistered nonmembers. However, beginning in mid-1969, during the impasse over Class B registration, the number of unregistered non-members dispatched to longshore work decreased, while the number of TW members dispatched to longshore work rose dramatically.

In October, 1969, also during the negotiations with PMA, the Union proposed that all those men on PMA's list of 475 Class B applicants with over 100 hours of longshore work in 1969 should receive Class B registration. By a coincidence that is by no means remarkable, the great bulk of those with the 100 hours were TWs who had already been sponsored by Union members to get their TW designation and who had been receiving referral preferences by the Union dispatchers. PMA refused to accept that proposal because it would have favored TW Union members over non-Union unregistered workers. This impasse also continued until February 12, 1970, when the Union at last voted to implement the arbitrator's award and dropped its insistence upon sponsorship.

## ISSUES

This case presents the following issues:

(1) Whether substantial evidence supports the Board's findings that the Union required Union-member or former Union-member sponsorship of Class B applicants and its conclusion that such a procedure violated §§ 8(b)(1)(A) and (2) of the Act.

(2) Whether substantial evidence supports the Board's finding and conclusion that the Union unlawfully discriminated against non-Union workers in its operation of the hiring hall.

(3) Whether substantial evidence supports the Board's findings that the Union insisted to an impasse on an illegal contract provision and unilaterally changed a term or condition of employment in mid-term of a collective bargaining agreement, thus violating § 8(b)(3).

(4) Whether the Board's remedy is reasonable and proper.

(5) Whether the Union's due process rights were violated.

## I. *The Time Bar of Section 10(b).*

The Union raises one argument which permeates the entire case. It maintains that section 10(b) of the Act, 29 U.S.C. § 160(b) (1970), bars any consideration of events which occurred before the six-month periods preceding the filing of the unfair labor practice charges. The relevant part of § 10(b) states: "[N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board . . . ."

The Union's reliance upon *Local Lodge No. 1424, Int'l Assoc. of Machinists v. N. L. R. B.*, 1960, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832, to support its interpretation of this section is misplaced. That case stands for the proposition that "where occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices . . . earlier events may be utilized to shed light on the true character of matters occurring within the limitations period; and for that purpose § 10(b) ordinarily does not bar such evidentiary use of anterior events." 362 U.S. at 416, 80 S.Ct. at 826 (footnote omitted) *See Int'l Union, United Auto., Aerospace and Agricultural Implement Workers v. N. L. R. B.*, 1966, 124 U.S.App. D.C. 215, 363 F.2d 702, 706–07.

With that proposition in mind, we turn to each of the unfair labor practice charges, considering first the evidence which shows the existence of the unfair labor practice during the relevant six-month period. Given such evidence, the Board could also consider earlier evidence to clarify the "true character" of those matters, and we also consider that evidence.

## II. *Unfair Labor Practices.*

### A. *Sponsorship.*

First, the consolidated complaints charge that the Union violated §§ 8(b)(1)(A) and (2) in the selection of applicants for registration as Class B longshoremen by requiring sponsorship by its members who were also Class A longshoremen.

We agree with the finding of the Board that the sponsorship program was a form of discrimination in violation of §§ 8(b)(1)(A) and (2). There is substantial evidence in support of this finding. *Universal Camera Corp. v. N. L. R. B.*, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

First, Phillips' testimony was that, according to a Union officer, the sponsorship program was in effect during the six-month period preceding his filing of the unfair labor practice charge in the *Gatlin* case.[1] Specifically, on February 20, 1969, Phillips inquired as to "what kind of consideration would be given [his 1967 application]" (R. 28, *Gatlin* transcript 44–45). Godfrey, the Union's secretary-treasurer, asked Phillips if he had a sponsor. Phillips said that he did not and was not aware that he needed one. Godfrey replied that "everybody knows you have to have a sponsor." The conversation ended when Godfrey said, "[Y]ou don't have a sponsor so I can't very well tell you what to do about it but there will be some applications out in the near future. I can't say when but you better fill out one and get a sponsor in the meantime."

The Trial Examiner in the *Gatlin* hearing accepted Phillips' testimony as credible, and that finding was not disturbed on the remand of this case. We see no reason why we should not accept it.

The Union argues that the crucial date was the filing of Phillips' application for Class B registration in 1967, but his conversation with Godfrey shows that on February 20, 1969, the Union was still requiring Class B applicants have a Union sponsor.

■ In addition, on October 2, 1968, within the relevant six-month period, and during negotiations with PMA, the Union submitted a list of Class B applicants. It listed the names of the applicants and, opposite each, the name of a Class A Union member sponsor. (*Gatlin* Exhibit No. 3) The minutes of those negotiation meetings show

1. Phillips' amended charge was filed on March 18, 1969, which makes September 18, 1968, to March 18, 1969, the relevant six-month time period under § 10(b).

that the Union was continuing to insist upon the sponsorship program during the crucial time period. Those events are sufficient to establish the existence of the unfair labor practice during the relevant period. Other evidence received by the Board helps to "shed light on the true character of matters occurring within the limitations period" and thus, under *Local 1424, supra,* may be considered by the Board. Much of that information reveals how the sponsorship program functioned.

■ The next question is whether the sponsorship requirement violated §§ 8(b)(1)(A) and (2). Section 8(b)(2) makes it an unfair labor practice for a labor organization "to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section . . .," and § 8(a)(3) prohibits an employer from engaging in any discrimination which encourages or discourages membership in a labor organization.

The Union argues that the evidence does not show that all Class A sponsors were Union members and thus does not show that the sponsorship program discriminated between Union and Non-Union workers. The Board found that at various times approximately six men who were members of Class A were not Union members. Three of those men may have eventually joined the Union. (Remand transcript at 86, 104.) There is no information in the record as to whether any of those non-Union Class A members ever sponsored a Class B applicant. Considering that the Union membership (i. e., Class A, Union members) fluctuated around 3,000 during the relevant period, the number of non-Union Class A members was insignificant. In addition, in the *PMA* case, the Union stipulated that, if called, witnesses would testify that "[a] sponsor in connection with the registration process is a member of Local 13, or a former member with a valid withdrawal card, who recommends the applicant for registration." (R. at 132–33.)

The Union states that "the connection between Union membership and sponsorship was the fortuitous result of the fact the [*sic*] most 'A' longshoremen became Union members." (Brief at 21.) The Board was not bound to accept the Union's claim that such a connection was fortuitous, and it did not do so. In all but an insignificant number of cases, only Union members could or did sponsor applicants for Class B registration. Thus, the Board properly found that, for all practical purposes, Class A sponsors were also Union members, and concluded that, given the facts of this case, the sponsorship program was a form of discrimination based on Union membership.

■ The Board also concluded that the discrimination is unlawful. Such a conclusion is proper where encouragement or discouragement of union membership is the foreseeable consequence or likely effect of the discrimination. *Radio Officers' Union v. N.L.R.B.,* 1954, 347 U.S. 17, 45, 74 S.Ct. 323, 98 L.Ed. 455. Here, each Union member who qualified as a sponsor was entitled to sponsor one person for Class B membership. That privilege was, in essence, a reward for being a Union member. Moreover, to qualify for Class B registration, thus becoming entitled to a preference over non-registered individuals, workers had to seek out Union members and ask their support. If they refused, the result was to block their Class B registration.

As the administrative law judge stated in his remand decision:

> [T]hese sponsors had been clothed by the Union with power over the livelihood of employees seeking registered employment status, including the power to deny sponsorship to an individual for wholly irrelevant [*sic*] or personal reasons or even because of an applicant's antiunion sentiments . . . .. For, a plan which requires sponsorship by the Union's members can only lead applicants to believe that there is a connection between his [*sic*] views toward the Union and his [*sic*] chances of obtaining a sponsor. (R. at 365.)

The natural effect of this sponsorship practice would be to encourage membership in the Union by creating a discrimination in hiring in favor of Class B registrants who

had been sponsored by Union members. We agree with the Board that the effect of the Union's sponsorship plan was to encourage Union membership, and that it thus violated §§ 8(b)(1)(A) and (2) of the Act.

■ The Union attempts to justify its reliance upon sponsorship by arguing that it was trying to give its black Class A registrants an equal chance to sponsor. The Board rejected that defense, stating that during the June, 1967, to February, 1970, period the Union "was not . . . motivated by any concern with giving the group of black members . . . who had been initiated into the Union from 1948 to March 7, 1951, . . . the same opportunity to sponsor as other groups." (R. at 363.) Other procedures could have been followed to increase black membership without relying upon sponsorship, and the record also shows that by continuing and expanding the sponsorship program and by using seniority in determining sponsorship eligibility, black sponsors were, arguably, being discriminated against. That evidence supports the Board's finding that this is not a valid defense.

■ The Board also found, in support of its conclusion that the sponsorship program was unlawful, and as an alternative ground, that the Union's insistence upon that program violated its duty of fair representation under Section 9 of the Act. We agree. A bargaining agent which serves as the exclusive representative of the employees has a duty to represent all the employees fairly. *Vaca v. Sipes,* 1967, 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842. This duty is violated when the Union acts "in an unreasonable, arbitrary, or invidious manner in regard to an employee." *Kling v. N.L.R.B.,* 9 Cir., 1975, 503 F.2d 1044, 1046.

In this case, selection for Class B registration had a substantial impact upon an employee's opportunities for employment because of the referral preference given to Class B members over non-registered workers. The Union's sponsorship system was not a rational means for determining the qualifications of Class B applicants; rather, it served as a form of patronage for Union members. Thus, by insisting upon this sponsorship system, the Union violated its duty to represent fairly all the employees in the unit—including those Class B applicants who did not have sponsors.

B. *Discriminatory Operation of the Hiring Hall.*

■ Union operation of an exclusive hiring hall, pursuant to a collective bargaining agreement, is not unlawful *per se, Local 357, Int'l Bhd. of Teamsters v. N.L.R.B.,* 1961, 365 U.S. 667, 673, 81 S.Ct. 835, 6 L.Ed.2d 11, but discriminatory dispatching which encourages union membership does violate §§ 8(b)(1)(A) and (2). *N.L.R.B. v. Local 542, Int'l Union of Operating Engineers,* 3 Cir., 1973, 485 F.2d 387; *Pacific Maritime Association v. N.L.R.B.,* 9 Cir., 1971, 452 F.2d 8; *N.L.R.B. v. Int'l Longshoremen's and Warehousemen's Union, Local 12,* 9 Cir., 1967, 378 F.2d 125.

■ The discriminatory referral charges regarding the hiring hall were made in the *PMA* case, which has never been reviewed by this court but was remanded to the Board, at its suggestion, after our order in the *Gatlin* case. The Union argues that substantial evidence of the unfair labor practice occurring during the relevant six-month periods is lacking.[2] Again, we disagree.

There is evidence that, when the Union and PMA reached an impasse in negotiations over the selection of additional Class B registrants, the Union added approximately 635 men as TW members of the Union, beginning this process after January, 1969. This was done despite the fact that, during typical months from January 1, 1967, to May 25, 1970, only about 80 to 86 TW members were steadily employed under terminal warehouse contracts. In 1969, the Union began to give more longshore job referrals to TW members rather than to

---

**2.** These charges were filed on September 15, 1969, and November 3, 1969, making the relevant time periods March 15, 1969, to September ber 15, 1969, and May 3, 1969, to November 3, 1969.

unregistered non-members. By October 1969 (within one of the required six-month periods) on over half the days, no unregistered non-Union workers were dispatched to longshore jobs, but substantial numbers of TW members were. The Board found that the TW members were receiving a referral preference. Considering the number of non-registered non-members dispatched in January, 1969, the dramatic shift from using non-registered men to TWs strongly supports that finding. Moreover, the rapid increase in the number of TW members, considering the small number of TW contracts and jobs available, also strongly supports the Board's finding that preferential referrals were being made.[3]

■ In addition, in October, 1969, the Union, during negotiations with PMA, suggested that individuals on PMA's list who had 100 hours or more of longshore work in 1969 be registered in Class B. The Union argues that work experience was a proper basis for selecting registrants. Normally that would be true, but here the suggestion would have aggravated the impact of the Union's preferential referral policy because most men on that list with over 100 hours experience in 1969 were TW members who had been preferred in referral to those jobs over non-registered non-members. The natural consequence of these preferences, therefore, coupled with the Union's proposal for registering men with 100 hours experience, would have been to encourage non-member casuals to join the Union and thus also be a violation of §§ 8(b)(1)(A) and (2).

## C. The § 8(b)(3) Charge.

■ Section 8(b)(3) of the Act imposes upon the Union an obligation to bargain in good faith.[4] Negotiations between the Union and PMA regarding the selection of additional Class B registrants began in 1967 and continued without resolution of the dispute until February, 1970. This occurred, or at least the Board could so find, because of the Union's insistence upon maintaining the sponsorship program or upon giving preference to individuals, mostly TW members, with 100 hours of longshore work.[5] When PMA refused to agree to either demand, an impasse was reached. While the duty to bargain collectively does not compel either party to agree to a proposal or require the making of a concession, it does prevent either side from insisting upon illegal demands. The Union's insistence to impasse, based as it was on unlawful practices, was a violation of its bargaining obligation. *N.L.R.B. v. Amalgamated Lithographers,* 9 Cir., 1962, 309 F.2d 31, 42–43.

■ In addition, the Union's preferential referral procedure was a unilateral change of the terms or conditions of employment in the middle of the term of a collective bargaining agreement, another

3. The Union in its reply brief argues that this drastic change can be blamed on a declining market for casual longshore labor. Because the TWs were bound by their TW agreement to be available for dispatch to TW jobs, more TWs would be likely to be available for dispatch to longshore jobs. Few casuals would report to the hall, the argument goes, because of the fewer extra jobs. That fails to explain, however, why on nineteen days in October, 1969, no unregistered longshoremen were dispatched and on those same days over one hundred TWs were. The Board could conclude that at least a few unregistered non-TW men were available for dispatch. This type of discrepancy strongly supports the Board's finding that the Union was giving TWs preference in referrals, despite the overall lower number of jobs available in October, 1969, as compared to January, 1969.

4. § 8(b)(3), 29 U.S.C. § 158(b)(3) (1970), provides:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \* \*

(3) to refuse to bargain collectively with an employer, provided it is the representative of his employees subject to the provisions of section 159(a) of this title;"

5. The Union argues that the failure to reach an agreement regarding Class B registration was not because of any sponsorship demands by it, but rather should be blamed on valid economic considerations, primarily, continuing negotiations concerning container jurisdiction, stuffing and stripping which was relevant to the registration question. The trial examiner in the original case, and the Board, did not accept that explanation. We find the Board's determination on this issue to be well supported by substantial evidence.

§ 8(b)(3) violation. The contract between the Union and PMA prohibits "favortism or discrimination in the hiring or dispatching or employment of any [qualified] longshoreman . . ." and provides for the dispatch of all non-registered men on a "rotational basis." By giving preference to its own TW members over non-registered nonmember casuals, the Union unilaterally altered those contractual terms or conditions of employment and violated § 8(b)(3). *See Associated Home Builders of Greater East Bay, Inc. v. N.L.R.B.,* 9 Cir., 1965, 352 F.2d 745.

### III. *Propriety of the Remedy.*

The Union objects to that part of the Board's order which requires it to "[m]ake whole any and all applicants for employment for any loss of earnings they may have suffered by reason of [the Union's] discriminatory exercise of its dispatch authority" and to "[m]aintain permanent records . . . reflecting the basis on which each dispatch is made." (R. at 238)

■ Section 10(c) of the Act authorized the Board "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this Act . . .". The Board's discretion in fashioning remedies which can fairly be said to "effectuate the policies" of the Act is broad. *N.L.R.B. v. Gissel Packing Co.,* 1969, 395 U.S. 575, 612, n.32, 89 S.Ct. 1918, 23 L.Ed.2d 547; *Fibreboard Paper Products Corp. v. N.L.R.B.,* 1969, 379 U.S. 203, 215–16, 85 S.Ct. 398, 13 L.Ed.2d 233. As the Court stated in *N.L. R.B. v. Strong,* 1969, 393 U.S. 357, 359, 89 S.Ct. 541, 543, 21 L.Ed.2d 546:

> This grant of remedial power . . . does not authorize punitive measures, but "[m]aking the workers whole for losses suffered on account of an unfair labor practice is part of the vindication of the public policy which the Board enforces." *Phelps Dodge Corp. v. N.L.R.B.,* 313 U.S. 177, 197, 61 S.Ct. 845, 854, 85 L.Ed. 1271 (1941). Back pay is one of the simpler and more explicitly authorized remedies utilized to attain this end.

(footnote omitted)

The Board's use of such remedies will not be disturbed in the absence of clear abuse of discretion. *Virginia Electric and Power Co. v. N.L.R.B.,* 1943, 319 U.S. 533, 540, 63 S.Ct. 1214, 87 L.Ed. 1568; *N.L.R.B. v. Seine and Line Fishermen's Union,* 9 Cir., 1967, 374 F.2d 974, 982–83.

The Union argues that the back pay award would be "in the order of several million dollars" and would conceivably destroy the Union. At this stage, the assertion is speculative. Because the compliance stage of the proceedings has not yet been reached, we have no way of knowing the exact amount involved. Moreover, even if the award did reach the total contemplated by the Union, that does not change its nature from remedial to punitive. The Board is simply requiring the Union to reimburse those who lost income as a result of the Union's illegal discrimination. The Board is not ordering that the employees be made more than whole. Thus, the order merely removes the effects of the unfair labor practice by giving those who were its victims what they would have received absent the Union illegal practices.

■ The remedial order is not an abuse of the Board's discretion. Nor does the requirement that the Union maintain permanent records overstep the Board's authority. *See Local 138, Operating Engineers v. N.L.R.B.,* 2 Cir., 1963, 321 F.2d 130, 138.

### IV. *Due Process.*

■ The Union's final argument, claiming a denial of due process, is without merit. There is no basis at all for an assertion that the administrative law judge did not fully consider the arguments and briefs of counsel. On the contrary, his opinion reveals an exhaustive consideration of all the major issues.

The Board's order will be enforced.