553 F.2d 1202
 95 L.R.R.M. (BNA) 2623, 81 Lab.Cas. P 13,244
 UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF PLUMBING
AND PIPE FITTING INDUSTRY OF THE UNITED STATES AND
CANADA, LOCAL UNION NO. 525, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 75-2393.
 United States Court of Appeals,
Ninth Circuit.
 May 10, 1977.
 
 Leonard I. Gang, Las Vegas, Nev., argued for petitioner.
 Elliott Moore, Vivian A. Miller, Atty., N. L. R. B., argued, Washington, D. C., Ralph Perez, Atty. for Gen. Counsel, N. L. R. B., Los Angeles, Cal., for respondent.
 On Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board.
 Before TRASK, GOODWIN and KENNEDY, Circuit Judges.
 KENNEDY, Circuit Judge:
 
 
 1
 United Association and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada Local Union 525, AFL-CIO (Local 525) petitions for review of an order of the National Labor Relations Board (the Board) finding it guilty of violating National Labor Relations Act (the Act) § 8(b)(1) (A), 29 U.S.C. § 158(b)(1)(A). The Board cross-applies for enforcement of its order.[1] Our jurisdiction over this case is predicated on 29 U.S.C. §§ 160(e) & (f).
 
 
 2
 Raymond R. Petrin, the complainant before the Board, was a member of Local 788 at Portsmouth, New Hampshire. In early 1975, Petrin received permission to work within the jurisdiction of Local 525 at Las Vegas, Nevada. Although Petrin was qualified as a building and construction trades journeyman, his membership book incorrectly designated him as a metal trades journeyman.
 
 
 3
 After Petrin presented his credentials to Weber, Local 525's Las Vegas business agent, Petrin's name was placed on Local 525's hiring list. On March 15, 1974, Petrin was dispatched to Reynolds Electrical and Engineering Co. (the Company), where he submitted his credentials to Jack Mogannam, Local 525's job steward. At that time, Petrin did not have his membership book, which he had mailed to his Portsmouth local to record a payment of current dues. In May 1974, after examining the book, which Petrin had received from New Hampshire, Mogannam noticed that it was a metal trades book rather than a building trades book. Petrin was told that a building trades book was required for the job and that he could not work until the designation was changed. A protracted series of discussions about Petrin's status followed; we refer briefly to the salient facts.
 
 
 4
 Weber and Mogannam met with Petrin on July 30, 1974. Petrin was told that he would be pulled off the job right away and that he was "off the job by Friday." Mogannam alone later saw Petrin and told him to fly East to put his book in order. When Petrin replied that under Nevada's right to work law he was entitled to and intended to continue working, Mogannam replied: "If you do, we will walk out."
 
 
 5
 On August 9, Mogannam informed Petrin that Weber was sending an "emergency letter" to the Company, informing the management that Petrin would take a ten-day leave of absence "to get (his) book straightened out." Later that afternoon, Mogannam orally informed the Company that Petrin would not report to work on Monday and that Local 525 would send appropriate notice to that effect.
 
 
 6
 On Monday, August 12, Petrin telephoned the Company's labor relations office and stated that he would not be reporting for work. Several days later, the Company contacted Petrin and asked him to return. The Company, however, told Petrin he would not be given any protection against Local 525. When Petrin inquired whether he could be given a job that would not interfere with the union, the Company representative replied: "There is no way (we) can interfere with the union contract." Petrin stated he did not want to cause a strike, and the Company referred him to its personnel assignment officer, who advised Petrin that his leave would be extended for several more days so that he could clarify his union status.
 
 
 7
 On September 11, Petrin resigned. He later claimed he did so to avoid discharge for an unexcused absence. On October 4, 1974, he filed the charges that are the subject of this action.
 
 
 8
 Adopting the administrative law judge's recommendation, the Board concluded that Local 525 had threatened Petrin with loss of employment and had coerced him to take a leave of absence because of purported irregularities in his union status. The Board held that those actions restrained and coerced him in the exercise of his statutory right to refrain from union activity in violation of section 8(b)(1)(A) of the Act, 29 U.S.C. § 158(b)(1)(A). One of the provisions of the Board's order is that Local 525 make Petrin whole with back pay for any loss of wages suffered as a result of the union's unfair labor practices.[2]
 
 
 9
 On appeal, Local 525 contends that the administrative law judge's determination, as adopted by the Board, was not supported by substantial evidence in the record, and that the Board's order awarding back pay to the complainant was improper. We affirm and enforce the Board's order.
 
 Administrative Law Judge's Finding
 
 10
 The administrative record contains evidence, in particular Petrin's testimony, that adequately supports the administrative law judge's findings of fact. Local 525 argued that Petrin resigned voluntarily to avoid union discipline for working with improper credentials; it contended that Petrin was not coerced in any way. Local 525 now claims that because of various discrepancies in Petrin's story, his testimony should have been ignored or discounted and that more weight should have been given to the testimony of government witnesses. We disagree.
 
 
 11
 We will not reverse a credibility finding unless the testimony on which that finding is based is inherently incredible. NLRB v. Longshoremen's and Warehousemen's Union, Local 10, 283 F.2d 558, 562 (9th Cir. 1960); see NLRB v. International Longshoremen's and Warehousemen's Union and Local 27,514 F.2d 481, 483 (9th Cir. 1975). Where the trier of fact has made explicit findings crediting the testimony of witnesses for one side and has given no credit to witnesses for the other side, we are especially reluctant to overturn his conclusions. NLRB v. Four Winds Industries Inc., 530 F.2d 75, 80 (9th Cir. 1976); NLRB v. Magnusen, 523 F.2d 643, 645 (9th Cir. 1975).
 
 
 12
 Here, the administrative law judge expressly stated that he was more favorably impressed with Petrin's demeanor than with that of Local 525's witnesses. The judge gave no credit to the union's version of events.[3] We hold that the administrative law judge's findings, as adopted by the Board, are supported by substantial evidence.
 
 Back Pay Award
 
 13
 Local 525 does not dispute that if the administrative law judge's factual determinations are upheld, it has indeed violated Petrin's rights under section 8(b)(1)(A) of the Act, 29 U.S.C. § 158(b)(1)(A). Nevertheless it contends that the Board had no authority to award back pay to Petrin.
 
 
 14
 Section 10(c) of the Act, 29 U.S.C. § 160(c), allows the Board to reinstate employees who have suffered unfair labor practices. That section also provides:
 
 
 15
 (W)here an order directs reinstatement of an employee, back pay may be required of the employer or labor organization, as the case may be, responsible for the discrimination suffered by him. . . .
 
 
 16
 We have recently reiterated that "(t)he Board's discretion in fashioning remedies which can be fairly said to 'effectuate the policies' of the Act is broad." NLRB v. International Longshoremen's and Warehousemen's Union, Local No. 13, 549 F.2d 1346, 1354 (9th Cir. 1977). Furthermore, the Board's use of a back pay remedy will not be disturbed in the absence of clear abuse of discretion. Id., citing Virginia Electric and Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943).
 
 
 17
 In determining whether to direct a union to reimburse an employee for back pay, the Board has emphasized that under section 10(c) of the Act its authority to make such awards is limited to those cases where the union has been responsible for unlawful discrimination against the employee. United Furniture Workers of America, CIO (Colonial Hardwood), 84 NLRB 563 (1949). Interpreting this statutory requirement, the Board has distinguished between those cases in which the employee is denied access to a plant, e. g., by striking employees, and those cases in which the union has interfered with the terms of the employer-employee relationship. The Board has stated that it will not order back pay in the former case, even though the union activity preventing ingress to the plant was unlawful. Id. at 565-66. The purpose of the doctrine is to prevent damage awards that might inhibit the union's right to strike. Union de Tronquistas de Puerto Rico, Local 901 (Lock Joint Pipe), 202 NLRB 399, 399-400 (1973). The Board has implemented this policy by emphasizing the statutory requirement that the union must be responsible for discrimination before an award of back pay is proper. Colonial Hardwood, 84 NLRB at 565.
 
 
 18
 Assuming, without deciding, that the Colonial Hardwood doctrine is a correct interpretation of the Act,[4] the concerns that caused the Board to deny back pay in that case are inapplicable here. The findings of the Board amply support a finding of discrimination justifying the back pay award on these facts. It is true, as Local 525 points out, that the Company did not fire Petrin, but that he quit; it is also true that the Company at one stage asked Petrin to return to work, although the union had expressly stated that he would be on leave. Taken alone, these facts tend to indicate that Local 525 did not interfere in the employer-employee relationship. But in contrast to the factual situations in Board decisions such as Colonial Hardwood and Lock Joint Pipe, in this case the union had extensive contact with the employer concerning the employee's status. Weber, the union's business representative, sent an emergency letter to the Company stating that Petrin would be on a ten day leave to straighten out his union status. On the same day Mogannam orally informed the Company of the matter. It was therefore Local 525 that conveyed to the Company the problem with Petrin's union status and that stressed the seriousness of the matter, which it believed to require immediate correction.
 
 
 19
 We recognize that Local 525 did not directly threaten the employer with a strike because of the Petrin situation. We see no reason, however, to absolve the union of responsibility where an employer acts unilaterally to discriminate in response to union pressure, even though it received no specific union request. National Cash Register Co. v. NLRB, 466 F.2d 945, 966 (6th Cir. 1972). In this case, the strike threats were voiced to Petrin on repeated occasions; when the Company asked him to return to work, Petrin communicated the threats to the Company. On being informed of the strike threats, the Company's representative stated that Petrin could not be given "any kind of protection" if he were to return to work. The representative also stated that the Company could not interfere with the union contract. The record supports the conclusion that the Company would allow Petrin to work only so long as the union took no action, but that it would not guarantee Petrin's position should the union decide to strike. After Petrin pressed his request for job security should a strike be called, Reyonlds' representative merely offered to authorize several days additional leave so that Petrin could correct his union status. Thereafter, Petrin had no alternative but to resign. In light of the above, the record supports the Board's conclusion that Local 525 is liable for back pay.
 
 
 20
 Further, the policy rationale behind Colonial Hardwood does not compel a finding that back pay is an improper remedy. In this case, the union activity was directed at a single employee, and there is no danger that the award in this case would inhibit Local 525 in exercising its right to strike or to engage in other protected activities.
 
 
 21
 In light of the foregoing, we hold that the Board did not abuse its discretion in awarding pack pay to Petrin. The order of the Board shall be enforced in full.
 
 
 
 [1]
 The Board's order is reported at 218 NLRB, No. 77 (1975)
 
 
 [2]
 The Board also ordered that the union cease and desist from the unlawful activities, that it notify the employer that it has no objection to Petrin's reinstatement, and that it grant Petrin preferential dispatch rights
 
 
 [3]
 For example, Mogannam and Weber testified that Petrin himself suggested that he fly back east to "straighten out" his membership status. Noting that Petrin had at all times dealt with his Portsmouth local by mail, the judge stated:
 With due regard for his prior course of conduct, no trier of fact could, reasonably, conclude . . . that Petrin would, voluntarily, undertake a costly, time-consuming, cross country trip, merely to correct some membership book and travel card discrepancies which could not, legally, provide any valid basis for challenging his job tenure.
 A trier of fact may rely on circumstantial evidence in making his credibility determinations. NLRB v. Longshoremen's & Warehousemen's Union & Local 27, 514 F.2d 481, 483 (9th Cir. 1975).
 
 
 [4]
 The validity of the doctrine has been called into question by at least one court. National Cash Register Co. v. NLRB, 466 F.2d 945, 965 (6th Cir. 1972)