**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BROADMOOR LUMBER COMPANY, Respondent.**

No. 77–1874.

United States Court of Appeals, Ninth Circuit.

June 16, 1978.

Rehearing Denied July 12, 1978.

Howard F. Fine (argued), Washington, D. C., for petitioner.

Harry Finkle (argued), of Littler, Mendelson & Fastiff, San Francisco, Cal., for respondent.

Before KILKENNY and CHOY, Circuit Judges, and EAST, District Judge.*

KILKENNY, Circuit Judge:

Respondent was charged with violating §§ 8(a)(1), (3) and (5) of the National Labor

---

* The Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

Relations Act [Act].[1] Subsequent to a hearing held in mid-April, 1976, the Administrative Law Judge [ALJ] concluded that respondent had in fact violated the provisions of the Act as charged. His decision was affirmed by the National Labor Relations Board [Board] in January, 1977. The Board seeks enforcement of this decision pursuant to the provisions of § 10(e) of the Act.

## FACTS

Fred Schlosser owned the respondent lumber company.[1a] Among his employees were five sales clerks; the subjects of the controversy in this action. In early January, 1975, Esmarch, a representative of the Freight Checkers, Clerical Employees & Helpers Local No. 856, Teamsters, [the Union] gave a number of union authorization cards to Mangion, one of the sales clerks. Mangion circulated the cards among his fellow sales clerks and shortly thereafter returned five signed cards to Esmarch. Sometime in early 1975,[2] Esmarch met with Schlosser. Esmarch testified that he showed Schlosser the union authorization cards and gave him a letter demanding that the union be recognized as the sales clerks' official bargaining agent.

During the late winter of 1974 and early spring of 1975 Schlosser began to interrogate his sales clerks about their union activity. Schlosser questioned Mangion and told him that he would be fired if he associated with any union. Schlosser also warned two other clerks that their jobs would be in jeopardy if they affiliated with any union. Schlosser and Esmarch met frequently on respondent's property in between their first meeting and the Brentwood Lodge meeting in May of 1975.

On May 16, 1975, against the advice of his attorney, Schlosser organized a meeting with Esmarch, Baker a representative of another teamsters local, and one other man. [Hereinafter referred to as the Brentwood Meeting]. Although the record does not establish the exact nature of the discussions held during this meeting, it does show that at the end of the session Schlosser told Esmarch to get something together in the way of a contract for the sales clerks and that he would then look at it. Two weeks after the Brentwood Meeting Esmarch delivered a copy of the proposed contract to Schlosser. Although there is some dispute as to the dialogue at this meeting, it is uncontroverted that Schlosser kept the proposal.

The summer of 1975 passed without progress in signing a contract between the sales clerks and the respondent. At one point respondent's attorneys raised the possibility of conducting an election. Esmarch expressed serious reservations about the necessity of an election, contending that the Union had already been recognized when Schlosser first saw the authorization cards. After the sales clerks had signed the authorization cards and they were presented to Schlosser, their compensation was significantly upgraded without any notification to the Union. All of the clerks received hourly wage boosts. Moreover, there were new moves by management to provide the clerks with a health insurance plan.

On September 12, 1975, the clerks went on strike. Although Esmarch contended that the strike was in response to respondent's threats to the clerks about joining a union, most of the clerks testified that the strike was called in an effort to pressure the respondent into signing a collective bargaining agreement. Schlosser did hire replacements for the striking sales clerks. The strike ended on September 26, 1975, and the men returned to the lumber yard seeking reinstatement. They were not immediately reinstated, but were allowed to rejoin the work force in late 1975.

---

1. 29 U.S.C. § 151, et seq.

1a. He owned the capital stock, was president of the company, and beyond question was a supervisor within the meaning of §§ 2(11) and (13) of the Act.

2. The record is not clear if the meeting occurred in February or in April.

The record also demonstrates that Schlosser talked with the strikers while they were picketing. Mangion was told that at least one sales clerk would be laid off if the Union contract was signed. Other clerks testified that Schlosser promised to meet any union demand if the clerks would only return to work and withdraw their attempts to force him to sign a collective bargaining agreement.

## DISCUSSION

At the outset we are reminded of the very narrow standard of review in Board decisions. The court must affirm any Board decision to the extent that it rests on findings of fact for which there is substantial evidence in the record. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *NLRB v. Pacific Grinding Wheel, Inc.*, 572 F.2d 1343 (9th Cir. 1978).

### I. *Section 8(a)(1)*.

Petitioner contends that the respondent violated § 8(a)(1) of the Act by threatening and interrogating employees about their union activity, granting wage and benefit increases to employees to discourage union organization and by enticing clerks to stop their strike by offering to settle various matters. We agree.

It is well settled that interrogation of employees about their union activity is a violation of § 8(a)(1). *Free-Flow Packaging Corp. v. NLRB*, 566 F.2d 1124, 1131 (C.A.9 1978); *NLRB v. Squire Shops, Inc.*, 559 F.2d 486, 487 (C.A.9 1977). The record clearly shows that the interrogation took place. First, several of the sales clerks testified before the ALJ that Schlosser had questioned them. Second, the ALJ chose to believe the clerks' testimony, and since he had the benefit of observing the witnesses' demeanor, etc. we could reverse only if a clear preponderance of the evidence convinced us that he was incorrect. *NLRB v. Western Clinical Laboratory, Inc.*, 571 F.2d 457, 459 (C.A.9 1978); *NLRB v. R. O. Pyle Roofing Co.*, 560 F.2d 1370, 1371–72 (C.A.9 1977); *United Ass'n of Journeymen & Apprentices of Plumbing & Pipe Fitting Industry Local 525 v. NLRB*, 553 F.2d 1202, 1205 (C.A.9 1977).

Institution of wage and benefit increases during the organizational process is viewed as just as destructive as threats and interrogation. *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). Because the respondent voluntarily recognized the Union, as will be discussed *infra*, it follows that it was unlawful for the respondent to offer these increased benefits without Union notification. *Queen Mary Restaurants Corp. v. NLRB*, 560 F.2d 403, 408 (C.A.9 1977).

The final challenge made under § 8(a)(1) is that Schlosser made comments and promises to the strikers to induce them to return to their jobs without a collective bargaining agreement. Again this type of activity is improper. *NLRB v. Triumph Curing Center*, 571 F.2d 462, 469–71 (C.A.9 1978). The record is uncontradicted that Schlosser spoke with the strikers. Although the subject matter is in dispute, we again choose to honor these findings of the ALJ which are based on substantial evidence. Circumstantial evidence in these circumstances is just as trustworthy as direct evidence.

### II. *Sections 8(a)(5) and (1): Refusal to Recognize and Bargain with the Union.*

No election being held, we must now determine if the respondent voluntarily recognized the Union. Voluntary recognition is a favored element of national labor policy. *NLRB v. Broad Street Hospital & Medical Center*, 452 F.2d 302, 305 (C.A.3 1971). The following facts support the petitioner's contention that Schlosser did indeed choose to recognize the Union. First, the ALJ accepted Esmarch's testimony that Schlosser did see the authorization cards. Although this was disputed, and no copy of the letter demanding recognition was available for the ALJ's review, it is not our function to challenge the credibility of the various witnesses. Second, the evidence demonstrates that Schlosser and Esmarch did hold a number of meetings subsequent

to the first presentation of the union authorization cards. Third, and most important are the facts surrounding the Brentwood Meeting. The only third party to testify about the substance of the meeting was Baker. He said that at the conclusion of the session Schlosser told Esmarch to prepare a proposed contract. This testimony coupled with the fact that the whole Brentwood Meeting was organized at Schlosser's direction supports the finding that Schlosser voluntarily recognized the Union. Consequently, we hold there is substantial evidence that respondent breached §§ 8(a)(5) and (1) of the Act by withdrawing recognition before the passage of a reasonable time.

III. *Section 8(a)(3): Refusal to Reinstate Immediately the Striking Sales Clerks.*

 Returning economic strikers do not have an automatic right to reinstatement. *General Teamsters Local 162 v. NLRB*, 568 F.2d 665, 668 (C.A.9 1978). Unfair labor practice strikers are entitled to reinstatement. *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309 (1956). The ALJ held that since the respondent did not dispute the petitioner's contention that the strike was motivated by unfair labor practices, he would so hold. However, the record does not support this conclusion. Three of the striking sales clerks testified that the strike was totally economically motivated. Unfair labor practices must be deemed a "contributing cause of a strike" for the court to characterize it as an unfair labor practice strike. *Queen Mary Restaurants v. NLRB, supra* at 410. Inasmuch as the employees themselves viewed the strike as economic and because the record indicates nothing to the contrary, the strike was economic and the striking employees were not entitled immediately to reinstatement under the teaching of *General Teamsters Local 162 v. NLRB, supra* at 668.

IV. *Bargaining Order.*

We must also consider whether the violations of the Act were so pervasive as to make resolution of employer-employee problems through normal labor channels impossible. If so, then a bargaining order should be granted. In light of the number and severity of respondent's unfair labor practices, we hold that a bargaining order is appropriate. *NLRB v. Triumph Curing Center, supra*, at 474–78. Again, the Board's finding on the subject is supported by substantial evidence.

## CONCLUSION

The petition of the NLRB seeking enforcement of its order must be granted.

IT IS SO ORDERED.