**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**LOCAL 542, 542–A AND 542–B, INTER-
NATIONAL UNION OF OPERATING
ENGINEERS, and William E. Ciavaglia,
its business agent, Respondents.**

No. 72–1837.

United States Court of Appeals,
Third Circuit.

Argued May 3, 1973.

Decided Sept. 20, 1973.

Joseph T. Thackery, N. L. R. B., Washington, D. C., for petitioner.

Martin J. Vigderman, Freedman, Borowsky & Lorry, Philadelphia, Pa., for respondents.

Before HUNTER and WEIS, Circuit Judges, and SCALERA, District Judge.

## OPINION OF THE COURT

SCALERA, District Judge.

### JURISDICTIONAL STATEMENT

This matter comes before the court on application of the National Labor Relations Board (hereinafter Board), pursuant to § 10(e) of the National Labor Relations Act, as amended (61 Stat. 136, 73 Stat. 519, 29 U.S.C. § 151 et seq.), for enforcement of its order issued March 31, 1972 against Local 542, 542–A and 542–B, International Union of Operating Engineers and William Ciavaglia, Business Manager of the various locals (hereinafter collectively the Union).

The issues are properly before this court, as the labor practices complained of took place in Philadelphia, Pennsylvania.

## FACTS

The Union acts as the bargaining and business agent for the operating engineer craft in Eastern Pennsylvania and Delaware. As business agent the Union has provided and continues to provide an exclusive hiring hall service whereby it refers people on its hiring list to various job openings.

Prior to 1965, access to the Union and/or its hiring list was relatively unrestricted. Unskilled individuals (not operating engineers) who sought placement on the Union's hiring hall referral list and did not join the Union were placed on the hiring list and were given "green books." These non-skilled, non-union personnel were classified as "oilers" and were referred to as "A-registrants." Upon joining the Union, oilers were given an "A book" to replace the "green book" and were referred to as "A branch" members. Other persons with sufficient engineer operating skills seeking placement on the hiring hall referral list but declining to join the Union were placed on the referral list as "B-registrants." "B-registrants" joining the Union became "B branch" members.

In 1965 and 1966, methods of gaining access to the Union and/or its referral list were greatly altered as a result of a registered apprenticeship training program instituted by the Union and its contracting employers. The program had several major objectives. It sought to raise the quality and proficiency of the operating engineers in its jurisdiction, to open the Union and the craft to minorities, and to phase oilers out of the referral group through retirement and other consensual forms of attrition. To accomplish this last goal, the Union stopped placing new "oilers" on the Union roster or the hiring list. At this point oilers were eligible for placement on the Union roster and/or hiring hall list only if they were established employees of contracting companies recently organized by the Union. Oilers who were already on the referral list or who were members of the Union, however,

were retained with complete job referral rights. After the program began, people with enough experience and skill to satisfy the Union's standards for an operating engineer could still register on the hiring list as "B-registrants." Upon joining the Union, if they chose to do so, these operators became "B branch" members. Unskilled candidates, however, could gain final acceptance into the Union and/or its hiring list *only* by satisfying the apprentice program's entrance requirements and by actively pursuing the program's course of study. Upon successful completion of the apprentice program, the candidate emerged as an operating engineer with the right to remain as a permanent member of the Union and/or its job referral group. According to rules published August 11, 1970, if a candidate washed out of the training program, he forfeited his place with the Union and/or the job referral group. No prior published rule mandated such forfeitures.

Initially, the apprentice training program sought apprentices among those who were already Union oilers. At a later date, candidates were solicited among the non-union oilers who were members of the job referral group. Finally, the program began to seek apprentices from outside the established job referral group. These new apprentices were subject to the conditional acceptance discussed above.[1]

The Union has always referred members of its hiring list (both union and non-union) under a seniority system— the workers with the most work experience are called first. The labor agreement which controlled the Union's referral practices at all times relevant to this dispute (dated May 1, 1968) provided that job referrals be made without regard for the applicant's union or non-union status. The relevant agreement indicates that referrals should be made on the basis of seniority and establishes the following referral priority groups:

Group I—All registered apprentices and those who had completed the registered apprentice training program and all other work applicants with 5,000 hours of work in the preceding eight years or 2,500 hours within the past three years.

Group II—Those with 2,500 hours within the past twelve years or 400 hours per year in any three of the past five years, or 400 hours during the past year.

Group III—All others.

These provisions were specifically designed to place apprentices in the highest priority group so that they would be exposed to a maximum amount of on-the-job training.

In 1962, Freeman became an "A-registrant" (oiler) on the Union's job referral list. He joined the Union in 1965, changing his status to "A branch oiler." At a Union meeting in 1965, Union officials told Freeman and other Union oilers that if Union members joined the apprentice program and later washed out, they would nevertheless remain in the Union. In 1966, Freeman joined the apprenticeship program, dropping out several months later. Freeman was permitted to retain Union membership and full job referral rights.

Szuchon began work on July 1, 1966, when he was placed on the job referral list as an "A-registrant oiler." He never joined the Union. On April 5, 1967, Szuchon applied for the apprentice training program. On April 17, 1968, Szuchon entered the apprentice training program after signing an agreement which obligated him to perform on-the-job and classroom training assignments

---

1. The rules governing the program's apprentice intake practices (promulgated August 8, 1968, published May 1, 1969, revised and republished August 1, 1970) indicate that anyone accepted into the Union or the job referral group after May 1, 1969 was accepted on the condition that he successfully complete the program. Anyone in the referral group prior to May 1, 1969 could remain with full job referral rights despite the existence of the apprentice program.

in accordance with regulations established by the Joint Apprenticeship Committee. This induction agreement did not contain any provisions indicating that Szuchon would forfeit his job referral rights if he failed to complete the apprenticeship program.[2]

On August 28, 1968, the Union promulgated a set of oral rules governing the selection and processing of skilled and unskilled candidates for membership in the Union or the job referral group. These rules were published for the first time on May 1, 1969. That portion of these rules covering the apprenticeship program indicates that candidates will be given an apprenticeship test and an interview, and further provides that immediate openings will be filled from those with the highest total scores. Those candidates who pass the test but who are not immediately accepted into the program will be placed on a program waiting list and, in addition, will be given a low priority position on the job referral list. The rules also provide that any apprentice candidate on the job referral list must enter the apprenticeship program when called or be removed from the job referral list. Finally, this version of the rules indicates that it will not affect the rights of anyone presently on the job referral list. In a revised version of these rules adopted and published on August 8, 1970, the Union tightened the program's entrance requirements by adding age limits and formal educational requirements. This revised version also provides that anyone washing out of the apprenticeship program will be removed from the job referral group and Union membership. These rules retain the provision which indicates that the status or rights of any man on the job referral list as of May 1, 1969 remain unaffected.

In March of 1969, the Joint Apprenticeship Committee eliminated Szuchon from the apprenticeship program because of his chronic failure to attend classes. The Joint Apprenticeship Committee advised him by letter on March 27, 1969 that he had been eliminated from the program with a right of appeal within five days. This notification was made without the Union's knowledge that on March 15, 1969, Szuchon had entered military service. Thereafter, on June 11, 1969, the Union wrote Szuchon that he would have sixty days after leaving the service to appeal the Joint Apprenticeship Committee's decision eliminating him from the apprenticeship program.

Szuchon was discharged from military service on September 29, 1969. In October he returned to the hiring hall, presented his certificate of honorable discharge, registered on the out-of-work list, was given a registered apprentice book, and was referred to several jobs. Later in October the Joint Apprenticeship Committee became aware that he was being referred for employment and set up an appeal meeting at which he appeared, as ordered, on November 26. On December 3, he was notified that his appeal had been denied with no further right of review. In the meantime, in November, when Szuchon went to the Union hall to pay his dues, his book was taken from him and he was advised that he was "no longer a member in the Union." He then filed suit against the Union under the Veterans' Reemployment Act and continued to work until March 1970, when that proceeding, in the Union's words, "became a dead issue," whereupon Szuchon's employer was advised that it must dismiss him and did so. Szuchon applied for Union membership on March 9, but this request, too, was denied because of the Joint Apprenticeship Committee's action in December. He also filed a charge with the Board alleging discriminatory discharge, which was dismissed.

2. As indicated by the induction agreement and testimony produced before the trial examiner, the Joint Apprenticeship Committee had the power to discipline apprentices and to dismiss them from the apprenticeship program but only the Union could revoke the referral rights of those in its job referral group.

During November, the Business Agent denied Szuchon classification in any referral group under the contract.

After being denied a referral listing, Szuchon wrote to Ciavaglia stating that he had applied for referral, had been refused, and was therefore requesting arbitration pursuant to Article II, § 2(m) of the contract. He received no answer to this letter and, accordingly, filed the charge which resulted in the matter being litigated before the Board. After a review of the proceedings before the trial examiner and the trial examiner's opinion, the Board reversed the examiner and found that the Union had discriminated against Szuchon in violation of 29 U.S.C.A. § 158(b)(1) and (2) [§ 8(b)(1) and (2) of the National Labor Relations Act as amended by the Taft-Hartley Act].[3]

To remedy this discrimination the Board ordered the Union to restore Szuchon to the appropriate referral priority group with full credit for all hours worked in the apprenticeship training program. The Board also awarded Szuchon back pay for work missed as a result of the Union's refusal to refer him. The Union has not complied with the order and thus the matter comes before us on the Board's petition for enforcement.

In its brief and in argument, the Union opposed enforcement of the order with three basic propositions:

1. Szuchon was denied registration with the Union and/or its referral group because he no longer met the entrance requirements, rather than as a result of his non-union status.

2. The Board's order subverts the goals of the apprenticeship program by encouraging people to enter it solely for the purpose of accumulating seniority hours and without any intention of becoming operating engineers. In subverting the program, the Board's order clearly contravenes the federal statutes which encourage and sanction apprenticeship programs.

3. The complaint issued by Regional Counsel for the Board asked for a Union Tribunal to review Szuchon's removal from the referral list. At the hearing the Union offered to convene such a tribunal. When Regional Counsel refused this offer, the issue was mooted, depriving the Board of power to process the complaint.

We find that these arguments lack merit.

## DECISION

In considering the enforceability of the Board's order in this case, we must determine:

1. Whether the Board's findings of fact are supported by substantial evidence on the record as a whole.

2. Whether the Board conducted a full and fair hearing and observed all procedures required by law.

3. Whether the Board's order is reasonably designed to effectuate the policies of the Act.

4. Did the Board handle the matter in accordance with law and without taking action that is arbitrary or capricious?[4]

If the Board satisfied all of these requirements, we must enforce its order.

3. The Board is seldom irrevocably bound by the trial examiner's findings and conclusion. See Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); N. L. R. B. v. Duncan Foundry and Machine Works, Inc., 435 F.2d 612 (C.A.7, 1970); S. A. Healy Co. v. N. L. R. B., 435 F.2d 314 (C.A.10, 1970); Acme Products, Inc. v. N. L. R. B., 389 F.2d 104 (C.A.8, 1968); N. L. R. B. v. Johnson, 310 F.2d 550 (C.A.6, 1962); Utica Observer-Dispatch v. N. L. R. B., 229 F.2d 575 (C.A.2, 1956).

4. For the sources of these criteria see 5 U. S.C.A. § 706 (Administrative Procedure Act —Scope of Review); 29 U.S.C.A. § 160(c) and (f) (National Labor Relations Act as amended by Taft-Hartley Act); Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); 29 U.S.C. A. § 160(c); Fibreboard Paper Products Corp. v. N. L. R. B., 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964).

## I

In light of these criteria, the Union's first argument must be regarded as a challenge to the sufficiency of the evidence upon which the Board made its findings. This argument pales upon close inspection because the record holds a wealth of evidence indicating that Freeman and Szuchon were similarly situated in all matters except their Union status and the Union's handling of their job referral rights. Both were members of the job referral group before the Union adopted rules barring further induction of unskilled labor,[5] and both failed to complete the training program. When they entered the training program, no rule formal or informal indicated that graduation was prerequisite to retention of their job referral rights. In fact, Union President Dawson candidly admitted that although both Szuchon and Freeman were "in the mill" prior to May 1, 1969 (the date on which the Union stopped taking new oilers and on which it guaranteed continuing job referral rights to all oilers already in the referral group) Szuchon was required to relinquish his guaranteed referral rights for limited referral rights conditioned upon his successful completion of the program, while Freeman was not required to relinquish his guaranteed referral rights because he was a Union member.

■■ This evidence which indicated that the Union has favored a Union member over a similarly situated nonmember provides the Board with sufficient grounds for inferring that the "true purpose" or "real motive" of the disparate treatment is to encourage and coerce membership in the Union in violation of 29 U.S.C.A. § 158(b)(1) and (2). Local 357, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. N. L. R. B., 365 U.S. 667, 81 S.Ct. 835, 6

L.Ed.2d 11 (1961). The Board may make this inferential finding of motive and intent by applying the long-enduring legal maxim that a party is presumed to intend the natural, foreseeable consequences of its acts. Local 357, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, supra. In Radio Officers' Union v. N. L. R. B., 347 U.S. 17, 74 S. Ct. 323, 98 L.Ed. 455 (1954), the court said:

> . . . encouragement and discouragement [of Union membership] are "subtle things" requiring "a high degree of introspective perception." Cf. N. L. R. B. v. Donnelly Garment Co., 330 U.S. 219, 231, [67 S.Ct. 756, 91 L. Ed. 854] 864. But as noted above, it is common experience that the desire of employees to unionize is raised or lowered by the advantages thought to be attained by such action. Moreover, the Act does not require that the employees discriminated against be the ones encouraged . . . . 347 U.S. at 51, 74 S.Ct. at 341, 98 L.Ed. at 483.

■ Against this legal backdrop, the record amply supports the Board's finding that the Union discriminated between Szuchon and Freeman in order to encourage increased Union membership. The validity of this finding is not diminished by the absence of "independent proof that encouragement of Union membership actually occurred." Radio Officers' Union v. N. L. R. B., supra, 347 U.S. at 48, 74 S.Ct. at 340, 98 L.Ed. at 481.

## II

■ The record does not contain any hard statistical evidence that would enable the Board or this court to measure even the potential impact of the order upon the apprenticeship training program. In the absence of real evidence indicating how many oilers might be en-

5. Under the Rules for Handling A and B Registrants (first promulgated August 8, 1968, published May 1, 1969, and revised and republished August 1970), an unskilled man could qualify for membership in the Union and/or the job referral group *only* by qualifying for and completing the apprenticeship program.

couraged to enter the program solely to accumulate job referral seniority and without any *bona fide* intention of pursuing the program to its completion, we cannot fault the Board's conclusion that this argument should not control its disposition of the case. We note that the Board's order is drawn in very narrow terms (applicable by its terms only to Szuchon) and while at this juncture we do not presume to predict the order's effect in future situations, it appears that the order's implications can be construed so narrowly that very few, if any, people could follow Szuchon's path to seniority and thereby subvert the apprenticeship program.

Finally, even if we were convinced that enforcement of the Board's order would lead logically and inescapably to the ultimate misuse and frustration of an apprenticeship program sanctioned and encouraged by federal statute, we would nonetheless feel compelled to enforce the order on the theory that the Board is empowered to honor the specific and narrow prohibitions of § 8(b)(1) and (2) of the National Labor Relations Act as amended by the Taft-Hartley Act (29 U.S.C.A. § 158(b)(1) and (2)), even in derogation of the general policies embodied in 29 U.S.C.A. § 50.[6]

### III

The Union's last argument, stripped of unnecessary embellishment, asserts that the Board went beyond the bounds of the complaint in trying the case and fashioning a remedy. Inherent in this position is the assertion that the Union was not given fair notice of the issues and thus was deprived of an opportunity to fully prepare its case for presentation to the trial examiner. While the complaint issued by the Regional Counsel is not part of the record presented to this court, and while the remarks made before the trial examiner indicate that the complaint specifically requested *only* a Union tribunal, we conclude that the Union still obtained a full and fair hearing of the merits before the examiner. Szuchon's request for the tribunal was clearly and obviously intended to obtain redress for Szuchon's removal from the Union's referral list. In requesting this same specific remedy, the complaint gave fair notice to all that the remedy was requested merely as a "cure" for the underlying problem— Szuchon's improper dismissal. In our view, given the existence of this general notice, the Board cannot be faulted for choosing a different remedy which goes directly to the heart of the dispute. We note the record indicates that the Union fully developed the operative facts and circumstances surrounding Szuchon's dismissal and the reasons therefor.

We conclude that the order of the Board should be enforced as written.

---

6. "The Secretary of Labor is authorized and directed to formulate and promote the furtherance of labor standards necessary to safeguard the welfare of apprentices, to extend the application of such standards by encouraging the inclusion thereof in contracts of apprenticeship, to bring together employers and labor for the formulation of programs of apprenticeship, to cooperate with State agencies engaged in the formulation and promotion of standards of apprenticeship, and to cooperate with the Office of Education under the Department of Health, Education, and Welfare in accordance with section 17 of Title 20." 29 U.S.C.A. § 50.