603 F.2d 1383
 102 L.R.R.M. (BNA) 2515, 87 Lab.Cas. P 11,554
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
WISMER AND BECKER, CONTRACTING ENGINEERS, and International
Brotherhood of Electrical Workers Local Union 497,
Respondents.
WISMER AND BECKER, CONTRACTING ENGINEERS, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 77-2151, 77-2282.
 United States Court of Appeals,
Ninth Circuit.
 Sept. 12, 1979.
 
 Allison W. Brown, Jr., N.L.R.B., Washington, D. C., for petitioner.
 Frederick A. Morgan, San Francisco, Cal., Hugh Hafer, Seattle, Wash., for respondents.
 On Application for Enforcement of, and Petition to Review, an Order of the National Labor Relations Board.
 Before HUFSTEDLER and ANDERSON, Circuit Judges, and GRANT,* District Judge.
 PER CURIAM:
 
 
 1
 The National Labor Relations Board petitions this court for enforcement of its order holding Wismer and Becker, Contracting Engineers, and the International Brotherhood of Electrical Workers Local Union 497 in violation of Sections 8(a) (1) and (3) and 8(b)(1)(A) and (2), respectively, of the National Labor Relations Act, as amended, and ordering that certain affirmative remedial actions be taken.[1] Wismer and Becker has petitioned for a review of the Board's decision and requests that its order be set aside. The petitions were consolidated here with jurisdiction predicated upon Sections 10(e) and (f) of the Act. 29 U.S.C. § 160(e) and (f).
 
 
 2
 Wismer and Becker is a California corporation operating as a mechanical and electrical contractor in the commercial construction industry. The company is a member of the National Electrical Contractors Association (NECA) and its employees on each project are represented by the International Brotherhood of Electrical Workers (IBEW) with all labor relations governed by contracts between IBEW local and NECA regional chapters.
 
 
 3
 In late 1973 or early 1974 the Bureau of Reclamation of the United States Department of the Interior awarded the company a contract for completion of electrical and mechanical facilities at a powerhouse at the Grand Coulee Dam in the State of Washington. As was customary, the company, prior to employment of any personnel for the project, contracted with the respondent Union to become bound by the terms of a collective bargaining agreement between the Union and the applicable NECA regional chapter. The agreement provided, Inter alia, for the exclusive referral of employees by the Union.[2]
 
 
 4
 In March, 1974, the Union and the company became involved in a dispute concerning the adequacy of sanitary facilities in the electricians' change shack on the work site at Grand Coulee. The company discharged five employees who, on the instructions of the Union, had declined to report to the site; and in retaliation the Union refused to dispatch any employees from its hiring hall to Wismer and Becker during the period between March 6 and June 23, 1974. During that period the company, pursuant to the terms of the collective bargaining agreement,[3] directly hired 30 employees from other sources.
 
 
 5
 On March 18, 1974, the Union filed a grievance with the Joint Conference Committee alleging that the five men who were fired were discharged unjustly and, after the Committee deadlocked, the matter was referred to the Council on Industrial Relations for binding arbitration. There it was decided that Wismer and Becker should reinstate the five electricians without backpay. On June 24, the Union dispatched 25 men, including the five dischargees, to the Wismer and Becker job site. The company at that time reinstated the dischargees but refused to comply with the Union's request that it dismiss the direct hires and replace them with the remaining 20 union referrals, informing the Union that the direct hires were "eligible for classification" under Section 5.5 of the contract and, therefore, were not "temporary employees" subject to replacement by dispatches from the hiring hall.
 
 
 6
 A grievance was again brought before the Joint Conference Committee, the Union alleging that since the direct hires had not registered on the union books and had not gone through the union referral procedure, they could not, under the provisions of the labor agreement, be anything but "temporary employees". The Committee concurred and Wismer and Becker capitulated, discharging 26 of the employees it had hired during the dispute and replacing them with union referrals.
 
 
 7
 An unfair labor practice complaint was then filed against both Wismer and Becker and the Union on behalf of those who had been released. Therein it was contended that the company's acquiescence in the Union's demand that the direct hires be discharged was violative of Sections 8(a)(1) and (3) of the National Labor Relations Act; and that the Union violated Sections 8(b)(1)(A) and (2) of the Act by refusing to dispatch employees from its exclusive hiring hall and by causing Wismer and Becker to discharge those workers it had directly hired during the dispute.[4]
 
 
 8
 The case was heard by an administrative law judge who ruled that the Union did not violate the Act when it refused to register or dispatch employees from the hiring hall; but found both Wismer and Becker and the Union guilty of violations for the discharge of the 26 direct hires:
 
 
 9
 When the Union, by its refusal to refer any workmen to Employer, abrogated Article 5 of its contract, . . . Employer was free to obtain workmen from any source. . . . Employees so hired acquired all the rights guaranteed in Section 7 and protected by Section 8(a)(1) and (3) and 8(b)(1)(A) and (2) of the Act. . . .When the Union demanded that these employees be replaced by strangers to the employment relationship, for the sole reason that replacements would carry valid Union referrals, the Union attempted to cause the Employer to discriminate against employees to encourage Union membership . . . and thereby violated Section 8(b)(2) of the Act. When the Employer acquiesced in this demand it violated Section 8(a)(3) of the Act. By these acts Employer and Union restrained and coerced employees in the exercise of their Section 7 right to refrain from assisting the Union. Employer thereby violated Section 8(a)(1) and Union violated Section 8(b)(1)(A) of the Act.
 
 
 10
 Wismer and Becker, 228 NLRB 779 at 799 (1977).
 
 
 11
 The National Labor Relations Board affirmed the finding of unfair labor practices with respect to 24 of the discharged employees but, in addition, held that the Union did violate the Act by refusing to dispatch three of the direct hires who had been union members and had specifically requested that the Union refer them to Wismer and Becker for employment. (See Ftnt. 4, Supra.) The Board noted in reversing this portion of the administrative law judge's decision, that the Respondent Union in the instant case was vested with an exclusive right of referral but retained a concomitant obligation to refer applicants without regard to union considerations. Refusal to dispatch the three who had here requested referral was said to be "an integral part of (the Union's) plan to apply pressure on Wismer and Becker and to insure that only loyal union members who had cooperated in refusing to seek jobs with the employer during the 'dispute' would ultimately be hired for the Grand Coulee Dam project." Wismer and Becker, supra, at 782.
 
 
 12
 The Board found this to be in derogation of the employees' right under Section 7 of the Act to refrain from supporting a labor organization, as it encouraged membership in the Respondent Union in violation of 8(b)(1)(A) and (2) of the Act. Both Wismer and Becker and the Union have been ordered to cease and desist from engaging in unfair labor practices and to compensate the 24 discharged employees for wages lost, the Union assuming primary liability.
 
 
 13
 The company has asked the court to review the Board's order and the Board has petitioned for enforcement. We remand to the Board for a determination of whether or not the Union's wholesale refusal to dispatch employees was an abuse of the hiring hall process in violation of the Act.
 
 
 14
 Section 7 of the National Labor Relations Act provides in general, that employees shall have the right to form labor organizations and to bargain collectively through representatives of their own choosing. It also provides that they shall have the right to refrain from such activities except as required for employment pursuant to an agreement authorized under the provisions of the Act. (29 U.S.C. § 157.)
 
 
 15
 Section 8 makes it an unfair labor practice for an employer or a labor organization to restrain or coerce employees in the exercise of any rights guaranteed in Section 7. It also makes it an unfair labor practice for an employer to act, or for a labor organization to cause or attempt to cause an employer to act, discriminatorily in regard to hire, tenure, or any term or condition of employment, in order to encourage or discourage membership in a union. (29 U.S.C. § 158.)
 
 
 16
 Application of the Act to Union Hiring Halls
 
 
 17
 The concept of the hiring hall first materialized to eliminate wasteful, time-consuming, and repetitive scouting for jobs by individual workmen, and haphazard, uneconomical searches by employers. Particularly in the building construction industry the contractor who frequently is a stranger to the area where the work is done requires a "central source" for his employment needs; and a man looking for a job finds in the hiring hall "at least a minimum guarantee of continued employment." See Local 357, International Bro. of Team., etc. v. NLRB, 365 U.S. 667, 672-673, 81 S.Ct. 835, 838, 6 L.Ed.2d 11 (1961).
 
 
 18
 That the union operation of an exclusive hiring hall pursuant to a collective bargaining agreement is not per se unlawful has previously been recognized by this court. NLRB v. International Longshoremen's, etc., 549 F.2d 1346, 1353 (9 Cir. 1977), Cert. denied, 434 U.S. 922, 98 S.Ct. 397, 54 L.Ed.2d 279; Cf. Local 357, supra, 365 U.S. at 673, 81 S.Ct. 835. It is the use of such hall to restrain or coerce employees in the exercise of their Section 7 rights, or to cause an employer to discriminate against an employee in order to encourage or discourage membership in the union, which Congress has proscribed. NLRB v. Local 138 Int'l Union of Operating Engineers, 385 F.2d 874 (2 Cir. 1967).
 
 
 19
 Hence, discriminatory dispatching which encourages union membership,[5] or refusal to refer which results in discrimination in regard to hire the intent and effect of which is to encourage union membership,[6] has been held violative of the Act. In addition, this court has held that, "It is an unfair labor practice in violation of §§ 8(b)(1)(A) and 8(b)(2) of the National Labor Relations Act for a bargaining representative to act in an unreasonable, arbitrary, or invidious manner in regard to an employee." Kling v. NLRB, 503 F.2d 1044, 1046 (9 Cir. 1975). As this court has further explained:
 
 
 20
 By wielding its power arbitrarily, the Union gives notice that its favor must be curried, thereby encouraging membership and unquestioned adherence to its policies. Laborers & Hod Carriers Local No. 341 v. N.L.R.B., 564 F.2d F.2d 834, 840 (9 Cir. 1977).
 
 
 21
 See also NLRB v. Bricklayers Local No. 7, etc., 563 F.2d 977 (9 Cir. 1977); Cf. Local 357, supra, 365 U.S. at 675-678, 81 S.Ct. 835; Radio Officers Union etc. v. NLRB, 347 U.S. 17, 46, 74 S.Ct. 323, 98 L.Ed. 455 (1954).
 
 
 22
 The Eighth Circuit in Fruin-Colnon Corp. v. NLRB, 571 F.2d 1017, 1023 (1978), observed that, "In our judgment . . . a union violates § 8(b)(1)(A) and (2) of the Act if it or its agent, adversely affects an employee's job for personal or arbitrary reasons." Similarly, in Painters Local Union No. 487, 226 NLRB 487 (1976), the National Labor Relations Board stated that unless a union can show that its conduct is not motivated by improper considerations of union membership or activity, or is not arbitrary, irrelevant, or invidious, actions preventing an employee from being hired demonstrates the union's influence over the employee and its power to affect his livelihood in so dramatic a way" . . . that we will infer or, if you please, adopt a presumption that the effect of its action is to encourage union membership on the part of all employees who have perceived that exercise of power". Cf. Int'l Union of Operating Engineers, Local 18 (Ohio Contractors Association), 204 NLRB 681 (1973).
 
 
 23
 To be sure, not every union attempt to influence employer action which in turn encourages or discourages union membership violates the Act. As the D.C.Circuit has so succinctly summarized:
 
 
 24
 The Local 357 case made it clear that whenever a union functions properly the encouragement of union membership is a natural by-product; and a union pursuing proper objectives will often cause an employer to take action which results in disparate treatment among employees; a disparity may develop from perfectly proper steps. In such cases the Act is not violated. However, if the union's action, directed to an employer, was intended to discipline an individual or a particular group for violation of union rules, or to encourage individuals to accept the authority of union officers, or to obtain advantages for union members over non-members, such action constitutes an unfair labor practice; it breaches the wall erected by the Act between organizational rights and job opportunities. Intention becomes the touchstone; in determining whether the section has been violated, the "true purpose" or "real motive" behind the actions of the unions should be ascertained. And here, as in every other fact-finding, inferences from circumstances are permissible. Some conduct, particularly conduct for which no legitimate purpose is shown, may by its very nature contain implications of the intent. In such circumstances the Board may properly find that the encouragement or discouragement of union membership was the natural foreseeable consequence of the conduct and that the action must have intended that result.
 
 
 25
 Lummus Co. v. NLRB, 119 U.S.App.D.C. 229, 234-235, 339 F.2d 728, 733-734 (1964). (Footnotes omitted. Emphasis supplied.)
 
 
 26
 In the case at bar, the court notes that injury has resulted not only to the 26 direct hires who were discharged, but presumably also to the 30 men registered on the Union's out of work list who were denied employment between March 6 and June 23 because of the Union's freeze on referrals during this period. It was said in Lummus that ". . . if a union has an exclusive hiring hall for all employers having work in a given area, and it refuses to refer to any employer whatsoever, for the proscribed reasons, it violates the Act." Lummus v. NLRB, supra, 119 U.S.App.D.C. at 236, 339 F.2d at 735.
 
 
 27
 In its decision here, the Board made no ruling concerning the propriety of the Union's wholesale refusal to refer. Because of the importance of this issue,[7] and because a determination of whether a hiring hall practice is discriminatory and therefore violative of federal law is a judgment which Congress has entrusted to the National Labor Relations Board,[8] we remand for the Board's consideration of whether or not the Union's refusal here contravenes the provisions of the Act.
 
 
 28
 REMANDED to the National Labor Relations Board.
 
 
 
 *
 Honorable Robert A. Grant, Senior United States District Judge, Northern District of Indiana, sitting by designation
 
 
 [1]
 The Board's decision and order was issued on March 16, 1977, and may be found at 228 NLRB No. 779
 
 
 [2]
 Other pertinent provisions were as follows:
 Cl. 1.6 All questions or disputes which are not adjusted between the Union and the Employer shall be referred to the Joint Conference Committee (which consists of three members representing the Union and three members representing the Employer.)
 Cl. 1.9 Should the Joint Conference Committee be unable to agree or adjust any matter . . . such shall then be referred to the Council on Industrial Relations for a decision which shall be final and binding on both parties.
 Cl. 5.4(a) The Union shall maintain a register of applicants for employment established on the basis of groups delineated by years of experience, formal training, and residence).
 Cl. 5.5 The Union shall notify the employer when he places his call if there are no applicants in the above groups who will apply to the employer . . . and the employer shall be free to secure applicants from other sources. . . . Employees not eligible for classification in one of the above groups shall have the status of "temporary employees" and shall be replaced by qualified individuals as soon as registered applicants for employment are available under the referral procedure. . . .
 
 
 [3]
 See Cl. 5.5 of the agreement footnoted above
 
 
 [4]
 Apparently three of the direct hires had been members of the Union and had specifically requested that they be dispatched to the company's Grand Coulee job site. When the Union refused, they went to work for the company as direct hires and as a result were subsequently expelled from membership in the Union. The Union's refusal to refer them or to permit them to register on the union dispatch list for employment were both alleged to transgress the mandates of the Act
 
 
 [5]
 See NLRB v. Local 542 Int'l Union of Operating Engineers, 485 F.2d 387 (3 Cir. 1973); Pacific Maritime Association v. NLRB, 452 F.2d 8 (9 Cir. 1971); NLRB v. Int'l Longshoremen's and Warehousemen's Union Local 12, 378 F.2d 125 (9 Cir. 1967). See also NLRB v. Int'l Longshoremen's, etc., 549 F.2d 1346 (9 Cir. 1977)
 
 
 [6]
 Lummus Co. v. NLRB, 119 U.S.App.D.C. 229, 339 F.2d 728, 734 (D.C.Cir.1964)
 
 
 [7]
 It may be, for example, that the appropriate characterization of the problem here should have been abuse of the hiring hall process rather than the strike/labor dispute issue addressed below. If so, the Board's determination of liability may require alteration
 
 
 [8]
 See Local 357, supra