**INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, LOCAL 1408, AFL–CIO (Jacksonville Maritime Association), Petitioner, Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.**

No. 82–5285.

United States Court of Appeals, Eleventh Circuit.

May 31, 1983.

Joseph S. Farley, Jr., Jacksonville, Fla., for petitioner, cross-respondent.

Elliott Moore, Deputy Associate Gen. Counsel, Corinna L. Metcalf, Atty., N.L.R.B., Washington, D.C., for respondent, cross-petitioner.

Before RONEY and HILL, Circuit Judges, and MORGAN, Senior Circuit Judge.

JAMES C. HILL, Circuit Judge:

William Lindsey, Jr., a union member for 18 years, attended a 6 a.m. "shape-up" at International Longshoremen's Association, Local 1408's hiring hall on April 21, 1980. Lindsey worked as a longshoreman and attended the shape-up in order to receive his job assignments. The union uses the hiring hall to fulfill the employment needs of the multi-employer Jacksonville Maritime Association. This association represents employers engaged in longshore and stevedoring operations on the waterfront in and around Jacksonville. The number of jobs available depends on employer orders for gangs of stevedores. The hiring hall dispatches both union and non-union applicants based on seniority. Under the collective bargaining agreement, the employer reserves the right to hire and discharge. If the union decides not to dispatch a particular individual, that applicant cannot be selected by any gang foreman or header.

At the April 21 shape-up, Lindsey challenged the assignment of a member with less seniority, J.T. Holliman, to continue a training program which Holliman had previously commenced but to which Lindsey requested assignment. On April 18, the Jacksonville Port Authority, which trains union members in the operation of specialized equipment, requested the union to assign Holliman to continue the training which he had begun. The union customarily sends trainees, as opposed to workers, requested by the employer regardless of seniority, once they had begun training. Lindsey verbally attacked the union president, Landon L. Williams, both at the shape-up and later as Williams was going to his office. Having commenced the training program the previous week, Holliman was clearly entitled to the assignment.

Williams reported Lindsey's actions to the union's executive board. The board recom-

mended that Lindsey be required to apologize publicly to Williams and that he not be referred for work until he had done so. Lindsey offered to apologize to the union's financial secretary and to Williams' secretary, in whose presence he had used inappropriate language, but not to Williams himself. The union did not dispatch Lindsey for approximately one month at which time Lindsey filed this complaint.

The NLRB concluded that the union's refusal to dispatch Lindsey violated Section 8(a)(3) of the National Labor Relations Act by prompting the employer to discriminate against Lindsey. Consequently, the Board concluded that the union had engaged in unfair labor practices within the meaning of §§ 8(b)(1)(A) and 8(b)(2). We agree and enforce the Board's decision.

Section 8(a)(3) prohibits "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3) (1976). Section 8(b)(1)(A) proscribes a labor organization from restraining or coercing employees from exercising their Section 7 rights provided that "this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein." Section 8(b)(2) makes it an unfair labor practice for a labor organization

> to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.

The union contends that its refusal to dispatch Lindsey did not violate the Act by encouraging union membership in a discriminatory manner. The union argues that all cases dealing with § 8(a)(3) involve employees engaging in protected activity, i.e. organizational rights, which the unions

have attempted to stop by discriminatory means. The Longshoremen's Association argues that Lindsey was not engaging in such protected activity and that the union's action against him was not a discriminatory method of encouraging union membership. The union asserts that its decision accorded with a customary internal union policy needed to preserve the operation of the hiring hall and was therefore beyond the purview of the Act. *See NLRB v. Boeing Co.,* 412 U.S. 67, 93 S.Ct. 1952, 36 L.Ed.2d 752 (1973) (when union discipline does not interfere with the employer-employee relationship or otherwise violate a policy of the NLRA, the Board may not evaluate the fairness of union discipline meted out to protect a legitimate union interest).

The Board first held that Local 1408 operates an exclusive hiring hall to provide the Jacksonville Maritime Association with longshoring labor. Although an exclusive hiring hall arrangement is clearly lawful, a union violates Sections 8(b)(1)(A) and 8(b)(2) if it refuses to refer an employee from a hiring hall because of the employee's non-member status or for some other arbitrary or irrelevant reason. *NLRB v. Wismer and Becker, Contracting Engineers,* 603 F.2d 1383, 1388 (9th Cir.1979); *NLRB v. Local 138, International Union of Operating Engineers,* 385 F.2d 874, 877 (2d Cir.1967), *cert. denied,* 391 U.S. 904, 88 S.Ct. 1653, 20 L.Ed.2d 418 (1968). Union action, directed to an employer, which constitutes a disciplinary measure or which encourages acceptance of the authority of union officers violates the Act by breaching the wall erected by the Act between organizational rights and job opportunities. *NLRB v. Wismer & Becker, Contracting Engineers,* 603 F.2d at 1389.

Local 1408 first challenges the Board's conclusion that the arrangement between the union and the Jacksonville Maritime Association constitutes an exclusive hiring hall. The union and the association agreed in their collective bargaining agreement to "institute and maintain joint Union-Management hiring procedures, ... including arrangement for the dispatching

of men and gangs ...." The union operates a hiring hall to implement this agreement. The ALJ found that there was conflicting evidence as to whether employees must use the hall to obtain work. The ALJ credited testimony that employers sought longshoring labor elsewhere only in the "extremely rare" situations where the union's manpower was "totally exhausted." Union president Williams asserted that JMA members also hire individuals such as clerks, checkers, operating engineers, and machinists from other sources. The conclusion that another source may supply employees doing work not claimed by the primary labor organization does not preclude us from finding that the latter union is operating, as a matter of fact, an exclusive hiring hall or referral system. *See Local 394, Laborers' International Union,* 247 N.L.R.B. No. 5 (1980). Substantial evidence supports the Board's finding that Local 1408's hiring hall served as the exclusive source of longshoring labor on the Jacksonville docks. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We therefore conclude that Local 1408 operates an exclusive hiring hall for longshoring work on the Jacksonville docks.

■ The union then argues that since Lindsey's outbursts were not protected activity, the union's requirement of an apology did not violate the Act. This argument ignores the thrust of Sections 8(b)(1)(A) and 8(b)(2) which erect a barrier between union discipline and the employer-employee relationship. In *Radio Officers Union v. NLRB,* 347 U.S. 17, 40, 74 S.Ct. 323, 335, 98 L.Ed. 455 (1954), the Supreme Court held that the Act was

designed to allow employees to freely exercise their rights to join unions, be good, bad, or indifferent members, or abstain from joining any union without impairing their livelihood. The only limitation Congress has chosen to impose on this right is specified in the proviso to § 8(a)(3) which authorizes employers to enter into certain union security contracts, but prohibits discharge under such contracts if membership "was not available to employees on the same terms and conditions generally applicable to other members" or if "membership was denied or terminated for reasons other than the failure of the employees to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership."

*Id.* at 40, 74 S.Ct. at 335 (footnote omitted). No other discrimination aimed at encouraging employees to join, retain membership, or stay in good standing in a union is condoned. *Id.* at 42, 74 S.Ct. at 336. In *Local 357, International Brotherhood of Teamsters v. NLRB,* 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961), the Court addressed a somewhat similar factual situation to the one in the present case. In that case, the collective bargaining agreement required an employer to call the union or the dispatching hall designated by the union before hiring casual employees. A union member obtained casual employment with an employer who was a party to the hiring hall agreement without being dispatched by the union. The employer later discharged the employee on the union's complaint. The union subsequently refused to allow the employee to obtain employment through the hiring hall. The Court concluded that the union's action did not violate the Act since the parties were simply enforcing the collective bargaining agreement against union members. The case at bar differs from *Local 357* in that Local 1408 was not simply enforcing the collective bargaining agreement but was disciplining Lindsey by refusing to refer him.

The keystone of an unfair labor practice in a situation involving a hiring hall and union discipline rests on the principle that the union can not use the employer as a surrogate in enforcing its internal affairs. *See International Union of Elevator Constructors Local Union No. 8 v. NLRB,* 665 F.2d 376 (D.C.Cir.1981); *NLRB v. International Longshoremen's & Warehousemen's Union,* 514 F.2d 481, 483 (9th Cir.1975) (union's refusal to refer an employee because of employee's "abusive" conduct toward a member of the union executive board or because employee was "disrespectful" to a

union official violates Sections 8(b)(1)(A) and 8(b)(2)). An employee works for an employer, not for the union officials; the Act reinforces this distinction by prohibiting the union from threatening an employee's livelihood as a means of enforcing union discipline. *Id.* In determining whether the union's action directed to an employer was intended to discipline an individual or to encourage him to accept the authority of union officials, we must examine the true purpose or real motive behind the actions of the union. *NLRB v. Wismer and Becker, Contracting Engineers,* 603 F.2d 1383, 1389 (9th Cir.1979); *Fruin-Colnon Corp. v. NLRB,* 571 F.2d 1017, 1023 (8th Cir.1978); *Lummus Co. v. NLRB,* 339 F.2d 728, 733 (D.C.Cir.1954). In the case at bar, the evidence supports the Board's conclusion that Local 1408 intended to discipline Lindsey by refusing to refer him for work. The natural foreseeable consequence of the union's decision was to compel Lindsey and other union members to accept the authority of union officials. The union's requirement of a public apology does not fall within Section 8(b)(2)'s exception for enforcing payment of union dues. We, therefore, affirm the finding that Local 1408 committed an unfair labor practice in refusing to refer Lindsey and we enforce the Board's order.

ENFORCED.